GEORGE W. PATTON ET AL. *v.* BALLAM & KNIGHTS.

(58 A2d 817)

February Term, 1948.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed May 4, 1948.

*Ryan, Smith & Carbine* and *Finn & Monti* for the defendants.

*Sterry R. Waterman* and *John A. Swainbank* for the plaintiffs.

SHERBURNE, J. This is an action for breach of warranty. Since 1941 the plaintiffs, who are husband and wife, have operated a mink ranch in Pike, New Hampshire, for the purpose of breeding and raising mink for their fur. The defendants have also engaged in a like business at West Hartford for the past 10 or 11 years, and for the same period of time have manufactured a complete mink food for their own mink, and have sold and distributed this food to a number of mink raisers in Vermont and New Hampshire. The plaintiffs have purchased this food from the defendants, and have used it exclusively since they went into the mink business, and were so using it during 1946. During that year the plaintiffs suffered great losses, which they claim resulted because such food was not sufficiently nutritious and did not contain the proper elements to enable the mother mink to give birth to sufficiently healthy kits, and to give the kits during the nursing period sufficient and proper sustenance in the way of milk to enable them to live and mature properly. From a verdict and judgment for the plaintiffs the defendants have excepted. As to the breach of warranty the only question here in dispute is whether plaintiffs' losses are attributable to such food.

Viewed most favorably to the plaintiffs the evidence reasonably tended to show the following additional facts: Mink breed once a year in March, and the kits in litters averaging 4 to a litter are born between the middle of April and the end of May. The kits are left with their mothers for a nursing period of six to seven weeks, after which they are separated from them and reared in individual furring pens until the pelting season late in the fall. In the 1946 season the plaintiffs had 104 female breeders, to which were born 365 kits. An unusually large number of these kits died during the nurs-

ing period, and only 65 survived at the time of separation, and these did not grow up to normal size, and their pelts were small and of poor quality at pelting time. The defendants in 1946 fed their mink food to their mink and had more than normal losses, and as litter after litter were lost decided that there was something wrong. Another mink raiser in Pike, New Hampshire, who fed this food to his mink in 1946 had about 60 kits born, and only 10 survived until pelting time. A mink raiser in Randolph, who fed this food that season to his mink only raised approximately 70 kits to grow up from approximately 100 litters. During the period of a month from birth dead kits were scattered from one end of his ranch to the other, in the nests, on the ground, in the pens and on the wire. As a rule this mink food consisted of horse meat, fish, cereal, vegetables, organ meats such as spleen or liver, and cod liver oil. During 1946 frozen tripe and later on fresh tripe was used. The process followed in preparing the food was to grind and mix the ingredients into 700 pound batches. After the process was completed the mixture was frozen into 25 pound cakes, and then stored not exceeding 3 weeks in a frozen condition until delivered to customers. In cold weather deliveries were made once in two weeks, and in warm weather once a week. When the plaintiffs received their mink food they put it in a refrigerator, which held it between 24 and 30 degrees. When they were ready to use some they chopped it up in a pan and thawed it out before feeding. It was fed to their mink on top of the wire over the nest box, where the mink could reach up and take it. During the 1946 breeding season there was a change in the consistency of the food delivered to the plaintiffs, and it was softer and would not stay on the wire, and the mink didn't like it and wouldn't eat it until so starved that they had to. In addition to the foregoing are the facts which the admissions of the defendants and the testimony of Richard Pastene, hereinafter mentioned, tended to show.

██ Richard Pastene, who raised mink at Norwich and mixed his own mink food, testified, subject to exception, that in January, 1946, he and the defendants bought a car load of frozen tripe, each taking half of it. He began to use his half about the middle of February, and at whelping time lost breeding females and kits. By a process of elimination he ascertained that when he stopped using the tripe his difficulty cleared up. This evidence was received subject to showing that tripe from this car load was used in the mink

food which the plaintiffs were receiving at a time that it might have caused their difficulties. At the close of all the evidence defendants moved to have it struck out because it had not been connected up, and excepted to the denial of their motion. It was shown that a part of defendants' share of this car load of tripe was placed in their refrigerator at West Hartford with other frozen tripe, from which tripe was taken and mixed in their mink food. In the very last of May or the first of June, defendant Knights came to plaintiffs' place, and they complained to him about the quality of the food, and he noticed its sloppy condition and said that they were investigating and doing what they could, and when they found out anything they would let them know. Later he told them that the defendants bought a car load of tripe and used up a part of it in their mink food and discovered that it was spoiled, and they figured that the plaintiffs got food that had it in it, and they thought that tripe was the ingredient that was giving the trouble. Defendant Ballam testified that he decided that it was tripe that had caused the trouble, and that several of their customers lost mink that year. No question is raised in defendants' brief that these admissions were incompetent evidence, all that is said about them is that they add nothing to the weight of plaintiffs' evidence, and were conflicting, indefinite, and obviously based upon surmise and conjecture to such a degree as to make them inadequate bases to support the verdict. There is neither argument nor citation of authority to support this claim. In view of the defendants' long experience and their means of knowing how the mink food was prepared and their discovery that the tripe was spoiled, it can hardly be said that their conclusions were based upon conjecture and surmise, so as to have no weight in tending to show the cause of plaintiffs' losses. Since, so far as appears from defendants' brief, evidence of these admissions came in without objection upon the ground of competency, it was for consideration by the trial court and jury although largely matter of opinion or conclusion. *Dieter* v. *Scott,* 110 Vt 376, 383, 9 A2d 95; 53 Am Jur Trial § 351. See also annotation, 120 ALR 213-217. This evidence affords sufficient proof that tripe from the car load purchased by Pastene and the defendants was used in the mink food which plaintiffs were receiving at a time that it might have caused their trouble. Our attention, however, is called to the testimony of Donald Ballam, called as a witness by plaintiffs. He was the son of defendant Ballam and one of the foremen at de-

fendants' mink food plant. According to his testimony on cross-examination by defendants, no frozen tripe was put into the mink food after about the middle of March, after which fresh tripe was used. Allowing for the maximum storage time before distribution of three weeks, and two weeks between deliveries, no mink food with frozen tripe in it could have been fed to plaintiffs' mink more than five weeks after the middle of March and so could not have caused plaintiffs' losses, according to defendants' claim. In this connection it should not be overlooked that the plaintiffs had to invade the enemy camp to get evidence of what went into the mink food. A party is not bound by the testimony of his own witness, but may show that the fact is otherwise than he has stated it to be. *White River Chair Co.* v. *Conn. River Power Co.,* 105 Vt 24, 25, 162 A 859. The admissions of the defendants afforded evidence to the contrary, and the court and jury were not obliged to accept his evidence as conclusive. This exception is not sustained.

The defendants also excepted to the admission of the foregoing evidence of Pastene, and, as soon as evidence of the foregoing admissions of defendant Knights about the tripe was received, moved to strike it out, and excepted to the denial of the motion. The ground of these exceptions was that such an issue was not within the allegations of the complaint. They contended that the plaintiffs should be restricted in their proof to showing lack of some element in the mink food which rendered it lacking in nutritional value, under the allegation that the food "was not sufficiently nutritious and containing of the proper elements". Pastene's evidence tended to show that this tripe was injurious, and Knights' admissions tended to show that it was spoiled and was the ingredient that was giving the trouble. The word "nutritious" is defined in Webster's New International Dictionary as "nourishing; promoting growth and repairing natural waste". Any food that is injurious or spoiled cannot be considered as nutritious under this definition. It is a matter of common knowledge that such food has a tendency to cause sickness rather than promotion of growth and repair of natural waste. Such an ingredient is not a proper element to put into an animal food. This evidence was within the allegation of the complaint, and these exceptions are not sustained.

Later an animal pathologist was called as a witness for the plaintiff. A sample from Pastene's part of the car load of tripe had been sent to him for examination, and plaintiffs offered to show by him

that this tripe was heavily coated with colonic organisms or fecal matter and was not a safe food for any animal. This offer was made at the bench and was excluded. Just before this offer was made defendants' counsel stated that it had become evident that the basis of recovery was not any lack of any essential ingredient in the food, but had shifted to one that the food was contaminated, and moved that all evidence that had come into the case on that issue be struck because a departure from the basis of the complaint, and stated that it was an entirely different case, which they could not meet without a period of several weeks for preparation. This motion was denied subject to exception. On the strength of the foregoing the defendants now argue that this ruling amounted to an amendment of the complaint, and that defendants were placed at a disadvantage. Since the offered evidence was not received the only evidence in the case on this issue was as above set forth. None of this required a delay for preparation to meet it. A reading of the transcript shows that the issues raised by this evidence were as fully litigated, and the course of the trial was the same, as if they had been more specifically alleged. Were it necessary we would here allow an amendment of the complaint in this respect. *Chaffee* v. *Rutland Railroad Co.,* 71 Vt 384, 45 A 750; *Daily* v. *Swift Co.,* 90 Vt 69, 74, 96 A 603; *Towne* v. *Rizzico,* 113 Vt 205, 211, 32 A2d 129. Prejudicial error is not shown.

By a motion for a directed verdict, a request to charge and a motion to set aside the verdict and render judgment for the defendants notwithstanding the verdict the defendants raise the question whether there was evidence of sufficient quality and character to justify a jury acting reasonably to predicate a verdict thereon in favor of the plaintiffs. In our discussion of this question we need not repeat what we have pointed out about the tendency of the evidence. It should be further noted that in addition to the food prepared and sold by defendants nothing except water was given to the mink of plaintiffs and defendants and their other customers, and it was shown that the water in each case could not have been the source of the trouble. Because the mink ranches in all these instances were located in widely scattered areas there can be no inference of a general epidemic that would have caused the trouble, but the circumstances tend to show that the trouble could not have resulted from any other cause than the mink food. There was no opinion evidence, other than the admissions of defendants, that the

feeding of the food to the mother mink caused the trouble, but such evidence was unnecessary because it is a matter of general knowledge that the food an animal eats may affect its offspring and its milk, and the experience of other users of the mink food tends to show that this food caused plaintiff's losses.

This case is much like *Boguski, Admr.* v. *City of Winooski,* 108 Vt 380, 386, 387, 187 A 808, a case of contaminated drinking water. Adopting the reasoning of that case, what caused plaintiffs' losses? No absolutely positive answer can be given. No such answer is required by law. In the very nature of things no direct proof of the cause of the trouble can be given. Direct proof is not necessary. Circumstantial evidence may be resorted to, and such evidence will be sufficient to justify the verdict below, if there can be drawn therefrom a rational inference that the mink food with spoiled tripe in it was the source of the trouble. There must be created in the minds of the jurors something more, of course, than a possibility, suspicion or surmise, but the requirements of the law are satisfied if the existence of this fact is made the more probable hypothesis, when considered with reference to the possibility of other hypotheses. Nor is the reasoning to be employed in such cases necessarily that of cultivated and practiced minds; it is that of ordinarily intelligent understanding.

That the jury was fully justified in concluding that the tripe in the mink food was the cause of plaintiffs' losses cannot be disputed. The rulings of the court below on this question were without error.

Defendants have briefed two more exceptions, one to the argument of plaintiffs' counsel to the jury, and one to the denial of their motion to set aside the verdict. Defendants introduced evidence tending to show that the market value of mink kits at birth was $3 or $4, and $5 at the time of separation. This evidence was not disputed, but plaintiffs' evidence tended to show that if the kits that died had lived their pelts at pelting time would each have been worth $15, and that the cost of feeding each kit from the time of separation to pelting time would have been $4.50, and that the cost of pelting would have been 50¢ each.

The argument excepted to was, in substance, that the mink business is conducted on a yearly basis, that the mink raiser keeps his pens, his refrigerator and his breeding mink the year around in order to raise one crop and market it in November, that the plaintiffs had their plant and devoted their full time to the business, that

they had already gone through the cycle of mating and whelping, and simply had to devote their time to rearing the kits and caring for the breeders, that the only way to view their loss was to look at what they would have received in the fall if matters had progressed as they should have, and that they were entitled to recover for the kits lost the difference of $10 apiece between the cost of food and pelting and $15, the value of each pelt in the fall. This argument was excepted to on the grounds that no care was given to the dead kits, and that the cost of care, had they lived, should also be deducted, and that as the evidence of value of the kits at birth and at separation time was undisputed, such values could be the only basis upon which damages could be awarded for the dead kits. The motion to set aside the verdict was to the effect that the amount was wholly unsupported by the evidence, because by the undisputed evidence the value of the mink kits prior to the time of separation plus the amount lost in the sale of the pelts of the 65 mink would fall far short of the amount awarded as damages.

The court charged the jury that the measure of damages was the loss directly and naturally resulting in the ordinary course of events from the breach of warranty, and called attention to the evidence as to what the mink would have been worth in the fall had they lived and matured as expected, subject to the percentage of normal loss to be expected, to the cost of feeding to maturity and the cost of pelting, and to the evidence of the value of the kits at birth and at the separation period. This was excepted to on the ground that the only measure of damages as to the kits that died was their then market value.

The amount of the verdict was $2,714.40. Defendants agree that the loss on account of the 65 mink which survived could have been found to have been $520. This leaves $2,194.40 to be accounted for. A computation shows that this was more than could have been awarded upon defendants' theory, and less than could have been awarded by plaintiffs' measure of damages.

The only claim now made by defendants is that plaintiffs could not recover for the loss of the kits that did not live on the basis of what their pelts would have been worth had they lived to pelting time, less the cost of food and pelting, without also deducting the cost of the labor that would have been required in rearing and caring for them until they reached maturity, as to which there was no evidence. Granting that such cost should have been de-

ducted if there had been evidence that the plaintiffs could not have cared for so many mink, as they would have had if the kits had lived, without hiring help, the burden was upon the defendants to introduce evidence tending to show that hired help would have been required, and the cost of same, under the rule, that where the defendant asserts matters in reduction or mitigation of the plaintiff's claim or matters which defeat in part the damages claimed, the burden of proving such facts is upon the defendant. 15 Am Jur Damages § 329; 17 CJ 1025; 25 CJS Damages § 144, e at p. 791. These exceptions are not sustained.

*Judgment affirmed.*