## Ronald Allen, et al. v. Uni-First Corporation

[558 A.2d 961]

No. 86-103

Present: **Allen, C.J., Peck, J., and Keyser, J. (Ret.), Costello, D.J. (Ret.) and Connarn, D.J. (Ret.), Specially Assigned**

Opinion Filed December 23, 1988

Motion for Reargument Denied March 8, 1989

*Peter F. Langrock* and *Emily J. Joselson* of *Langrock Sperry Parker & Wool*, Middlebury, for Plaintiffs-Appellants.

*Robert Halpert* and *C. James Mathis, Law Offices of Kurrle & Halpert*, Montpelier, and *Jeffrey C. Bates* and *Nancer Ballard* of *Goodwin, Proctor & Hoar*, Boston, Massachusetts, for Defendant-Appellee.

**Allen, C.J.** In this nuisance action, plaintiffs sought damages resulting from defendant's use and disposal of hazardous chemicals in its Williamstown drycleaning plant. Plaintiffs, residents of Williamstown, contended below that defendant's operations had resulted in widespread contamination and that, consequently, their property values had been adversely affected. Judgment was entered for defendant, and plaintiffs appeal. We reverse and remand for a new trial.

## I.

In 1973, defendant commenced industrial drycleaning operations on a site immediately adjacent to the Williamstown elementary school. Its business consisted largely of cleaning industrial uniforms and "wipe rags" with the chemical solvent perchloroethylene, commonly known in the trade as "perc." Perc is a toxic, water-soluble, organic compound that evaporates easily.

In the drycleaning process used by defendant, soiled uniforms and rags were washed with perc, which was then siphoned off for recycling. A water rinse followed, and the rinse water was passed through a separator to remove most of the remaining perc. The water, still containing residual perc, was then discharged into the town's sewage system. A defective manhole in defendant's drainage system leaked some of the perc-contaminated water directly into the ground.

The perc that had been siphoned off after the initial cleaning was recycled by means of a distilling process, leaving a waste product known as "still bottoms." These still bottoms consisted of grease and other soils, as well as high concentrations of undistilled perc. Initially, defendant attempted to dispose of this sludge by depositing it in four-foot pits dug on its property. Four such pits were filled with still bottoms in the fall of 1973. Then, from late 1973 until 1980, defendant disposed of the still bottoms at the Williamstown landfill.

In 1981, the State discovered several organic chemicals, including perc, in Williamstown's town well. A continuing investigation revealed dangerously high concentrations of these chemicals in several private wells, in the soil at the town's landfill, in the soil around the still bottom pits and the leaking manhole on defendant's property, and in the air at the town's public schools. De-

fendant was ordered to discontinue its drycleaning operations temporarily.

In December of 1983, plaintiffs brought a private nuisance action against defendant in the Orange Superior Court, alleging that their property values had declined because of widespread contamination and the resulting public perception that Williamstown was an unsafe place in which to live. At trial, the jury heard plaintiffs' expert, a State hydrogeologist, testify that contamination had been found in the town well, several private wells, the landfill, and in the air around the elementary school and the high school. He opined that the sources of this contamination were the still bottom pits at defendant's plant, the leaking manhole, and the sludge deposits at the landfill.

Plaintiffs' expert testified further that the contamination had entered the bedrock and the deep acquifers beneath the town, that perc had been discovered at least 100 feet below the surface, and that the bedrock and topsoil beneath the elementary school had been contaminated. He testified that underground "plumes" of contamination were migrating slowly from the sources of the contamination and through the bedrock under the town. Finally, he noted that the State was continuing to monitor wells in the area because the levels of contamination might change and create health problems in the future.

Individual plaintiffs testified that the market value of their homes decreased following media reports concerning the contamination.

Defendant produced its own expert witnesses, who disputed the evidence given by plaintiffs' expert. Counsel for defendant also argued throughout the trial that the case should be tried on a theory of public nuisance rather one of private nuisance. The jury was instructed regarding both theories of liability.

The trial court submitted the case to the jury by means of a series of written interrogatories. With regard to the areas of actual contamination, these interrogatories limited the jury's consideration to two questions: (1) whether defendant had contaminated the town well, and (2) whether defendant had contaminated the air or groundwater at the public schools. Counsel for plaintiffs objected to the form of the interrogatories, noting that the court was "limiting [the jury's] determination of contamination exclusively to the public schools [and] the town well when it's reasonable that their assessment of the existence of the

nuisance is also going to consider the contamination plumes moving off-site down to the valley bottom . . . ."

Through its answers to the interrogatories, the jury determined that defendant had contaminated the air or groundwater at the public schools, but it went on to find that this contamination did not constitute a continuing nuisance. The trial court entered judgment for defendant, and this appeal ensued.

## II.

Plaintiffs urge that the trial court erred in restricting the jury's deliberations to questions concerning contamination of the town well and the public schools. They contend that this narrow focus upon two public facilities effectively precluded consideration of the overall contamination problem and prejudiced their right to a true verdict on the evidence adduced at trial. We agree.

In presenting a case to the jury, the court is duty-bound to charge on every issue essential to resolution of the controversy, *Currier* v. *Letourneau*, 135 Vt. 196, 204, 373 A.2d 521, 527 (1977), because the parties are entitled to have the whole case submitted to the jury. *Coolidge* v. *Ayers*, 76 Vt. 405, 409, 57 A. 970, 971 (1904). V.R.C.P. 49(b) allows the court to "submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict." Where, as here, a case involves multiple, overlapping theories of liability, trial courts are encouraged to make use of such interrogatories. *Prouty* v. *Manchester Motors, Inc.*, 143 Vt. 449, 450 n.1, 470 A.2d 1152, 1153 n.1 (1983). The very power of such devices, however, requires that the court exercise extreme care in drafting them; the interrogatories must enable the jury to resolve the factual issues essential to the general verdict. See *Kinjerski* v. *Lamey*, 635 P.2d 566, 567 (Mont. 1981).

Failure to incorporate into the interrogatories all issues covered by the court's charge to the jury may constitute reversible error. See *Robertson* v. *Kenmore-Town of Tonawanda Union Free School Dist.*, 112 A.D.2d 17, 17, 490 N.Y.S.2d 655, 656 (1985). Such a failure operates to restrict the jury's deliberations because, as a result, the jurors may disregard grounds of liability that were argued and supported by evidence. *Id.* This consequence is inescapable in cases where, as here, the structure of the interrogato-

ries prevents any consideration of issues not included in the written questions.*

In the instant case, plaintiffs' private nusiance theory was largely dependent upon their ability to establish a public perception of widespread contamination in Williamstown. At trial, in addition to testimony regarding the town well and the public schools, they presented evidence that several private wells were contaminated and that the bedrock and the deep acquifers beneath the town had become contaminated. Expert testimony was adduced to the effect that underground plumes of contamination were migrating slowly through the bedrock under the town. The trial court's charge to the jury acknowledged implicitly that such evidence of overall contamination had been presented:

> To find the defendant liable, you must first find that the defendant did release into the ground or air certain chemicals in a form that caused a nuisance . . . . If you find from the evidence that Unifirst did release [chemicals] into the ground or air in amounts sufficiently large to cause a pollution problem in the community, you may then consider the extent of the "public perception" of the pollution problem . . . .

The court reiterated:

> To prove damage to their properties here on the ground of a nuisance, the plaintiffs must show the following: [first,] that Unifirst unreasonably released at least potentially harmful chemicals into the environment in one way or another . . . .

In its closing instructions on the nusiance theory, the court stated:

> In short, you must consider all the facts surrounding the question of the alleged pollution and its impact on the value of each property. . . . The evidence as to the contamination in the wells and air of [homes belonging to nonplaintiffs]

---

* The interrogatory form read, in pertinent part, as follows:
  3. [D]id chemicals from Unifirst contaminate the water in the town well?
  4. [D]id chemicals from Unifirst contaminate the air or groundwater at the public schools?
  (if the answer to questions 3 and 4 were no, you need continue no further.)

may be considered by you when you assess the potential threat of the chemicals as a real or potential health hazard to the community at large and the homes of plaintiffs here in particular.

Thus, the court's charge to the jury in no way restricted its consideration to a particular locus of alleged contamination; instead, the instructions encouraged deliberation on the basis of evidence that tended to show generalized contamination. The interrogatories, in contrast, limited the jury to determinations regarding the town well and the public schools. "[I]n complex litigation the essential purposes of special questions are to assist the jury in differentiating among the various issues presented . . . and to isolate the damaging effect of any errors, but not to limit the jury's role by the simple expedient of submitting only a few narrow questions." *Henderson* v. *D'Annolfo*, 15 Mass. App. 413, 418 n.9, 446 N.E.2d 103, 107 n.9 (1983) (citations omitted.)

Defendant maintains that no evidence was presented at trial to establish any causal connection between the overall contamination theory and the alleged decrease in plaintiffs' property values. The trial transcript indicates otherwise: when asked to identify a reason for the perceived drop in property values, plaintiffs did not focus upon the town well or the public schools. Instead, they were virtually unanimous in identifying the problem as "contamination in the town," one witness observing that Williamstown "was not a healthy area to be in."

Defendant urges that the causal connection "must be directly supported by some evidence, a burden not overcome by the introduction of facts generating only conjecture, surmise or suspicion." *McAdam* v. *Wrisley*, 134 Vt. 19, 21-22, 349 A.2d 886, 887 (1975). As this Court noted in *Patton* v. *Ballam & Knights*, 115 Vt. 308, 58 A.2d 817 (1948), however:

> [W]hat caused plaintiffs' losses? No absolutely positive answer can be given. No such answer is required by law. In the very nature of things no direct proof of the cause of the trouble can be given. Direct proof is not necessary. Circumstantial evidence may be resorted to, and such evidence will be sufficient to justify the verdict below, if there can be drawn therefrom a rational inference that [defendant's product] was the source of the trouble.

*Id.* at 314, 58 A.2d at 821; see also *Boguski* v. *City of Winooski,* 108 Vt. 380, 387, 187 A. 808, 811 (1936) (jury held justified in concluding polluted water was cause of death even in absence of direct evidence). Here, the jury heard testimony regarding: (1) real estate values prior to media reports in July of 1983 concerning the contamination; (2) markedly decreased values as of July, 1983; and (3) offers and completed sales at these decreased values. They also heard plaintiffs testify that the sudden decrease in values could be attributed to no other factor. This evidence would allow lay persons of average intelligence to reach conclusions regarding causation based on their own knowledge and experience; "only in cases where the causal connection is obscure is expert testimony required." *Houghton* v. *Leinwohl,* 135 Vt. 380, 384, 376 A.2d 733, 737 (1977).

We hold, therefore, that the trial court erred in limiting the jury's consideration of the contamination issue to questions concerning the well and the schools. This error was prejudicial because there was evidence from which the jury could have found the existence of a permanent nuisance.

*Reversed and remanded for a new trial.*