STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Environmental Division Unit | ENVIRONMENTAL DIVISION<br>Docket No. 6-1-16 Vtec |

| | |
|---|---|
| **Vermont Agency of Natural Resources,**<br>     **Petitioner,**<br><br>     **v.**<br><br>**Ruby Construction, Inc., and**<br>  **Royal Harrison,**<br><br>     **Respondents.** | |

### Decision on the Merits

This environmental enforcement action began with what initially seemed to be a mysterious event. Residents along the western shoreline of Lake St. Catherine in the Town of Wells, Vermont, were enjoying a sunny Sunday afternoon when they heard a loud thundering noise coming from the hill behind their homes. Then, an enormous flow of water came down the hill, initially along an intermittent stream. The water flow was so enormous that it quickly exceeded the stream banks, overwhelmed a culvert, and washed out a portion of the adjacent town highway, West Lake Road. The water flow also damaged the neighbors' lawns, flooded their basements, and caused sediment to flow into Lake St. Catherine.

An investigation by local police and environmental enforcement officers from the State of Vermont Agency of Natural Resources ("ANR") did not initially reveal direct evidence of who or what caused the water flows. However, further investigation concluded with an ANR determination that the water flow originated from a pond in a former slate and rock quarry, known as the Mammoth Quarry. ANR issued an Administrative Order on November 6, 2015, and had it served upon the land owner—Ruby Construction, Inc.—and the operator of the Mammoth Quarry—Royal Harrison—(hereinafter collectively referred to as "Respondents"). The Administrative Order alleged that Respondents allowed, directed, and caused unpermitted discharges into Lake St. Catherine, a water of the state, in violation of 10 V.S.A. § 1259(a). The

1

Respondents filed a timely request for a hearing, pursuant to 10 V.S.A. § 8012.  Thereafter, the parties completed their discovery and prepared for trial.

ANR has been represented throughout this action by Randy Joe Miller, II, Esq.  Ruby Construction, Inc. has been represented by Karl C. Anderson, Esq.  Mr. Harrison has chosen to represent himself.

A trial was conducted at the Vermont Superior Court, Criminal Division, Rutland Unit, in Rutland, Vermont over two consecutive days, beginning on March 2, 2017.  The Court conducted a site visit prior to the start of the trial at both the pond and washout locations.  The Court found the site visits provided helpful context for the evidence presented at trial, although the Court reminded the parties that what was seen and said during the site visit would not be regarded as evidence.  Rather, trial witnesses were afforded the opportunity during their trial testimony to offer all relevant and admissible evidence.

Based upon the credible evidence admitted at trial, including that which was put into context by the site visits, the Court renders the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision.

## Findings of Fact

1.      Ruby Construction, Inc., owns an 81± acre parcel of land in Wells, Vermont, a part of which has been operated as the Mammoth Quarry.  The Mammoth, which is how the Quarry is often referenced, has been one of the oldest and largest operating slate quarries in the State of Vermont; it began operation more than 150 years ago.

2.      Mr. Ruby, the principal owner and officer for Ruby Construction, Inc., purchased the Mammoth and lands surrounding it from his grandfather, who had first purchased the property in the 1920s.  Through his corporation, Mr. Ruby once operated the Mammoth himself, but gave up doing so many years ago.

3.      Several years ago, Mr. Harrison contracted with Mr. Ruby to take over the operation of the Mammoth.  Mr. Harrison has a particular skill at retrieving marketable slate from areas of the Mammoth that have already been quarried.

4.      As part of his on-going quarry operations, Mr. Harrison brought several pieces of heavy excavation equipment onto the Mammoth and has hired one or more individuals to operate that equipment.  He also operates the equipment himself.

5.      Given the lay of the land inside and around the Mammoth, as well as the nature of quarry operations, there are many opportunities for beavers to build dams that impound sometimes large quantities of water.  Mr. Ruby has had several of these beaver dams excavated so that the impounded water may be released.

6.      The process of removing a beaver dam usually requires the use of large excavation equipment, even when only a portion of the dam is to be removed.

7.      April 13, 2014 was a clear, sunny day; no recent heavy rains had occurred.  Between 2:00 pm and 3:00 pm, residents along West Lake Road, in the vicinity of Horseshoe Bay on Lake St. Catherine, began hearing a loud, thundering noise coming from the hill behind their back yards, in the direction of the Mammoth.  Shortly after the noise began, an enormous volume of water, unlike any the residents could recall witnessing, began flowing from the direction of the Mammoth, towards the residents' homes, over West Lake Road, and into Horseshoe Bay.

8.      The enormous water flow initially followed an intermittent stream, but quickly exceeded its banks, causing erosion of the stream banks and the nearby lands.  The culvert that allows the intermittent stream to flow under West Lake Road quickly became clogged and overwhelmed with the water volume, causing the water to flow over West Lake Road, which caused portions of the road to be washed out.

9.      The resulting erosion caused silt, sediment, and other earthen materials to be transported by the water flow into Horseshoe Bay.

10.     The enormous flow of water lasted more than three hours.  The total volume of water was so enormous as to not easily be calculatable by either the residents or the Town and State officials who later investigated.

11.     The silt and other earthen materials that were transported into the Bay were so significant as to change the nature of that portion of the Bay from a lake body to a wetland.  These resulting changes, and the resulting nitrogen loading of the Bay (now wetland) have caused lily pads and other water-based plant growth in areas that were once open water and available for recreation.

3

12. Large deposits of silt, debris, and other earthen material remained on the remnants of West Lake Road, making it necessary for excavation equipment to be brought on site for removal and repair of the roadway.

13. The residents' lands were also extensively damaged, requiring repair work to be completed by excavation equipment and hand tools.

14. While the water was still flowing, one of the residents—Peter O'Brien—followed the flow of water up the hill until he reached the source of the water flow: a breached beaver dam along a pond on lands in or near the Mammoth. He observed and took photographs of the breached dam. Mr. O'Brien credibly testified at trial that there were fresh track marks from excavation equipment at and along the area where the beaver dam had been breached. The excavation equipment was not in the vicinity of the beaver dam breach by the time that Mr. O'Brien arrived on the scene.

15. The actual dam breach appeared to be caused by the excavation equipment, and not by any natural cause or breach that could have been caused by beavers or other animals. Photos admitted at trial as Exhibits 26 through 35 verify these observations.

16. The neighbors contacted local and state environmental officials to report the excessive water flow and resulting damage. The first officials to respond were the Town Constable and Fire Chief. The water flow was still in process when they arrived. In fact, the Fire Chief reported that he could hear large rocks tumbling down the hill as the rocks were pushed by the water flow.

17. Exhibit 37 is a photo depicting the Fire Chief and another official standing on a neighbor's lawn, just above the culvert under West Lake Road. This photo shows the strength of the water flow, several hours after the water flow began.

18. Exhibit 38 is a photo depicting the wash out of a portion of West Lake Road. By the time this photo was taken, the water flow continued, but had begun to slow.

19. Exhibit 39 is a photo of the water, silt, and debris flowing into Horseshoe Bay, several hours after it began.

20. The Constable and Fire Chief also followed the water flow up the hill, onto lands later determined to be owned by Ruby Construction, Inc. and in or near the Mammoth. They came to the source of the water flow: a large pond created by a beaver dam.

21. The Constable and Fire Chief observed that a portion of the beaver dam had been dug out by an excavator. They credibly made this determination because there were excavator track marks around the breached portion of the beaver dam and several trees knocked down and pushed aside, in an apparent effort to blaze an excavator's trail to where it was decided to breach the beaver dam.

22. Exhibits 41 through 43 are photos of the area where the beaver dam had been breached.

23. The Constable and Fire Chief decided to follow the excavator tracks away from the pond, in an effort to locate the excavator. They were able to follow the clearly marked excavator tracks for about a half mile, where they located the excavator. The excavator tracks that they followed ended at the back of the excavator. The tracks on the excavator were wet, evidencing that it had just been worked in a wet area or pond.

24. The Fire Chief located the engine compartment on the excavator and determined that the excavator had just recently been used, since the engine compartment was still warm to his touch.

25. The excavator is depicted in a photo admitted at trial as Exhibit 44; its VIN is depicted in the photograph that was admitted as Exhibit 35. At trial, Royal Harrison admitted that he is the owner and sometimes the operator of this excavator.

26. David P. Ricard, the Town of Wells Highway Foreman and patrol officer for the nearby Town of Pawlet, also visited the West Lake Road site, followed the water flow up into the Mammoth, and followed the excavator tracks from the breached beaver dam to the excavator. He also determined that the excavator had just recently been used, as the engine compartment was warm to the touch.

27. Mr. Ricard spoke with Royal Harrison the next day, who volunteered to Mr. Ricard that he had hired "a kid to run the excavator and fired him when he learned that he tore out a beaver dam." At trial, Mr. Harrison denied saying this. The Court found Mr. Ricard's testimony to be much more credible than Mr. Harrison's testimony on this issue.

28. Patrick J. Lowkes is an ANR Environmental Enforcement Officer. He responded to the initial complaint of the April 13, 2014 water flow and wash out. Officer Lowkes began his investigation on April 16, 2016 by making several phone calls, including to Mr. Ruby. During that initial telephone conversation, Mr. Ruby told Officer Lowkes that he had asked Mr. Harrison to

remove the beaver dam so that nearby quarry test holes could be investigated. Mr. Ruby also advised that the local Game Warden, Justin Stedman, had given Mr. Ruby permission to remove the existing beaver dam.

29.     Officer Lowkes contacted Warden Stedman, who advised that he had not spoken with Mr. Ruby about breaching a beaver dam and had not given him permission to do so.

30.     At trial, Mr. Ruby denied that he wanted to investigate quarry test pits near the site of the beaver dam breach and did not recall the details of his telephone conversation with Officer Lowkes.

31.     Officer Lowkes requested and received permission from Mr. Ruby to visit the Mammoth, which he did on April 21, 2014. He invited Mr. Ruby to accompany him, but Mr. Ruby declined and gave the Officer permission to enter the property alone.

32.     Officer Lowkes retraced the water flow from West Lake Road. Along the way, he observed the erosion caused by the recent water flow and took some pictures. See photo Exhibits 51 and 52.

33.     When he arrived at the now-drained beaver pond, he observed extensive excavation work at the breach of the beaver dam and could still make out the track marks left by the excavator, as well as the trees pushed over so that the excavator could reach the breached area. He took several photos of the drained beaver pond, the area of the dam breach, the pushed over trees, and the track marks left by the excavator; those photos were admitted at trial as Exhibits 53 through 65. The excavator track marks are difficult to make out, but are depicted in the center of photo Exhibit 54.

34.     The Officer credibly described the excavation work done at the dam breach to exhibit "purposeful" conduct by an excavator operator.

35.     On May 7, 2014, Officer Lowkes issued a Notice of Alleged Violation to Mr. Ruby, as the property owner for prohibited discharge of sediment from the Mammoth property and into Lake St. Catherine, per 10 V.S.A. § 1259(a).

36.     Officer Lowkes attempted to speak with Royal Harrison, but was unsuccessful.

37.     Several weeks after the severe water flow, one of the residents contacted Royal Harrison, who visited the site and agreed to have a contractor clean up the erosion and wash out areas.

The contractor also built an earthen berm on one of the resident's property to protect the home from future flooding. The contractor used excavation equipment and hand tools to complete the cleanup work, for which he charged Mr. Harrison $3,000.00.

38.     When the contractor asked Mr. Harrison why he was paying for the cleanup work, Mr. Harrison advised that it was his effort "to keep the peace in the neighborhood." The contractor testified that Mr. Harrison did not admit to him that he had caused the beaver dam breach.

39.     State officials initially advised Mr. Harrison and his contractor to not attempt to clean up the silt and other debris that had been washed into Horseshoe Bay. They advised that plans would first need to be approved and a permit issued for that work.

40.     The silt, sediment, and other material that the April 13, 2014 water flow transported into Lake St. Catherine covered an area within the Lake that is approximately thirty feet in length, twenty feet in width, and an inch or more in depth within the disturbed area. ANR officials credibly testified that at least twenty-two cubic yards of silt and sediment had been transported into the Lake.

41.     The silt and sediment infiltration into the Lake was so extensive as to starve some area fish of oxygen, thereby killing a number of fish in Horseshoe Bay. The neighbors saw the dead fish floating in the Bay.

42.     If the silt and sediment is not removed from the Lake, this area of Horseshoe Bay will continue to be transformed from a usable open water area to a wetland. Heavy plant growth will continue to occur, due to the jolt of phosphorous and nitrification caused by the discharges.

43.     For the silt and sediment to be dredged out properly and the open waters to be returned to this portion of Horseshoe Bay, a plan must first be prepared and approved. Turbidity curtains must be employed to minimize the flow of silt into other portions of the Lake. Work should be scheduled for the later part of the calendar year, so as to minimize the disruption of Lake use and fish spawning.

44.     These dredging plans will need to be detailed in an application for a lake encroachment permit. No dredging work may commence until that permit has been issued.

45.     The April 13, 2014 water flow incident was followed a bit more than a year later, on June 4, 2015, by a second, less severe flow of water down the hill behind the residents' homes

7

onto West Lake Road, and into Horseshoe Bay.  One of the neighbors immediately called the Town Fire Chief and a Town Selectman.  These three men walked up the hill to determine the source of the extra water flow.   They then filed a complaint with Environmental Enforcement Officer Lowkes's office.

46.     Officer Lowkes conducted a site visit on June 9, 2015, during which he met on site with Royal Harrison and another gentleman.  Mr. Harrison advised that they had been using pumps to de-water a quarry test pit.  While on site, Officer Lowkes observed the pump equipment and hoses that were used in this operation.

47.     The water that Mr. Harrison pumped out of the test pit flowed down the same intermittent stream, through the culvert under West Lake Road, and into Horseshoe Bay.  While this water discharge travelled the same path, it did not cause as much silt and sediment to be transported into the Lake.

48.     When Officer Lowkes advised Mr. Harrison during the site visit that he was responding to a complaint by the West Lake Road residents about an additional water discharge, Mr. Harrison advised that there wasn't or shouldn't be a problem with water discharges into the Lake and that the neighbors "make too much of it."

49.     Officer Lowkes devoted forty-five hours to his investigation of these Horseshoe Bay discharges, six hours to prepare for the two-day trial, and eight hours to attend and testify at the trial.  His wages and benefits as an Environmental Enforcement Officer cost ANR $34.00 per hour.

50.     The Environmental Analyst who credibly testified at trial about the effect of and remedies for the water discharges devoted twelve hours to investigating and analyzing these water discharges and five more hours to attend and testify at trial.  His wages and benefits cost ANR the equivalent of $26.53 per hour.

51.     ANR attorneys and their support staff devoted many hours to the investigation and prosecution of these water discharges.  They did not specify at trial the exact number of hours or their equivalent hourly rate.

### Conclusion of Law

Unpermitted discharges into waters of the state are clear violations of 10 V.S.A. § 1259(a), which provides that "[n]o person shall discharge any waste, substance, or material into waters of

8

the State, . . . without first obtaining a permit for that discharge from the [ANR] Secretary." This law has a common sense and understandable basis, since unregulated discharges into state waters can harm those waters and limit their use and enjoyment.

Based upon the credible facts presented, and for the reasons more fully detailed below, we conclude that both Ruby Construction, Inc., as property owner, and Royal Harrison, have caused the unlawful discharges that occurred on April 13, 2014 and June 4, 2015.

The parties do not dispute that an enormous water discharge into Horseshoe Bay occurred on April 13, 2014, but they do dispute whether the Respondents directed or conducted excavation activities that caused this discharge. At trial, Respondents denied having confessed to causing this discharge and there was no first-hand testimony from a trial witness who observed the Respondents or their agents causing this discharge. Rather, we received indirect and circumstantial evidence from ANR's witnesses, together with the additional admissions from Respondents, both of whom recanted those admissions at trial.

Adjudication does not require direct evidence to support a judgment. In fact, our courts have long relied upon circumstantial evidence to reach a judgment, particularly when that circumstantial evidence is deemed to be credible and cumulative. This practice has been recognized in Vermont for more eighty years. In the case of Patton v. Ballam & Knights, our Supreme Court noted that direct evidence is sometimes unavailable to a reviewing court; in the absence of direct evidence:

> No absolutely positive answer can be given [on what caused a plaintiff's damages. However, n]o such answer is required by law. In the very nature of things no direct proof of the cause of the trouble can be given. Direct proof is not necessary. Circumstantial evidence may be resorted to, and such evidence will be sufficient to justify the verdict below, if there can be drawn therefrom a rational inference that [defendant's conduct] was the source of the trouble. There must be created in the minds of the [factfinder] something more, of course, than a possibility, suspicion or surmise, but the requirements of the law are satisfied if the existence of this fact is made the more probable hypothesis, when considered with reference to the possibility of other hypotheses. Nor is the reasoning to be employed in such cases necessarily that of cultivated and practiced minds; it is that of ordinarily intelligent understanding.

115 Vt. 308, 314 (1948); see also Boguski v. City of Winooski, 108 Vt. 380, 387 (1936) (holding that the jury was justified in concluding polluted water was cause of death, even in absence of

9

direct evidence); and <u>Allen v. Uni-First Corporation</u>, 151 Vt. 229, 234–5 (1989) (case remanded to the trial court, so that the factfinder may be allowed to consider circumstantial evidence of individual losses caused by industrial cleaning contaminants that were released to ground water.).

The circumstantial evidence presented in the case at bar is strong and for the most part uncontroverted. While the Respondents initially suggested at trial that the enormous 2014 water discharge may have been caused by the beaver dam simply letting go, or by the eager beavers themselves, there was no evidence presented that supported either of these hypotheses. In fact, the only evidence presented convinced the Court that an excavator was used to breach the beaver dam, which resulted in the enormous discharge into the lake. Each of the ANR witnesses credibly testified to the earth disturbances at and around the beaver dam breach that could only have been caused by heavy equipment. Trees had been recently pushed over and moved, so as to make an access way for an excavator to the area of the dam breach. The neighbors and state and local officials who immediately visited the dam breach site were able to follow a consistent path of track marks to the excavator, which still had wet tracks and a warm engine compartment. Respondent Harrison admitted at trial that he owned and controlled the excavator that the neighbors and officials located.

Both Respondents initially admitted, in out-of-court statements that the Court admitted at trial as statements of parties against their interest, that they had directed that the beaver dam be breached. Perhaps it was Mr. Harrison that operated the excavator that breached the beaver dam, at Mr. Ruby's direction, or perhaps it was another individual who acted at Mr. Harrison's employment or direction. We may never know the specific details. But we need not wait for those specific details to be revealed, given the wealth of credible circumstantial evidence provided at trial. When coupled with both Respondents' initial admissions of responsibility, which we found more credible than their refutations at trial, we conclude that the preponderance of the evidence directs us to conclude that Respondents were responsible for the illegal discharge into Lake St. Catherine on April 13, 2014. See 10 V.S.A. § 8013(a) (requiring ANR to prove an alleged violation by preponderance of the evidence).

As to the unpermitted discharge that occurred on June 4, 2015, the credible evidence causes us to conclude that Mr. Harrison was responsible and that Mr. Ruby allowed or encouraged that activity to occur on his corporation's property. We reach this legal conclusion because we found Officer Lowkes's testimony about Mr. Harrison's admissions in June of 2015 to be more credible than Mr. Harrison's refutations at trial.

Given our legal conclusion that Respondents were responsible for the unpermitted discharges, we turn our analysis in this de novo proceeding to our determination of what fines or injunctive relief should be imposed. We have reviewed the fines and injunctive relief imposed by ANR through its Administrative Order, but we make our own determinations, based upon the evidence presented at trial, pursuant to 10 V.S.A. § 8012(b) (authorizing this Court to (1) determine whether the noticed violation occurred; (2) affirm, modify, or reverse any provision in the Administrative Order;[*] and (3) review and determine anew the penalty amount warranted by the facts presented).

For all the reasons stated above, we do hereby **AFFIRM** the legal determination contained in the November 6, 2015 Administrative Order that Respondents violated the prohibition against unpermitted discharges into waters of the state contained in 10 V.S.A. § 1259(a). Further, we affirm the Administrative Order legal determination that Respondents' unpermitted discharges on April 13, 2014 and June 4, 2015 caused significant damages to the waters of the state.

For the reasons summarized below, we generally **AFFIRM** the penalties and injunctive relief detailed in the Administrative Order, with one adjustment to the penalty imposed against Respondents, who we conclude shall be jointly and severally liable for both the penalties and injunctive relief.

In making our legal determinations as to penalties and injunctive relief, we are guided by the criteria in the Uniform Environmental Law Enforcement Act, specifically 10 V.S.A. § 8010(b); the criteria contained in that subsection are summarized below.

---

[*] The statute provides an exception for injunctive relief provisions in Administrative Orders that require the respondent to take actions necessary to achieve compliance, to abate potential or existing environmental or health hazards, and to restore the environment to the condition existing before the violation. 10 V.S.A. § 8012(b)(2) (referencing § 8008(b)(5)). In those instances, the Environmental Division may only affirm, or vacate and remand such provisions to the Secretary. We consider our actions here to be an affirmation of the injunctive provisions, since all remain exactly in place, save only for updating the deadlines within which Respondents must comply.

11

**Subsection (1)**: Under § 8010(b)(1), we consider "the degree of actual or potential impact on public health, safety, welfare and the environment . . . ." The impacts of Respondents' unlawful discharges are severe and continuing, especially in regards to the transformation of a portion of Horseshoe Bay from open waters to a wetland. The residents and visitors to Horseshoe Bay have been deprived of the use of what once was an open lake area, which is now populated with lily pads and other wetland plant life. The discharges also caused a fish kill. Unlike Mr. Harrison, we disagree that the neighbors have made "too much" of the water that scoured their land and impacted the Bay. Quite the contrary, we conclude that the neighbors have had a calm, responsible reaction to significant damage.

**Subsection (2)**: Under § 8010(b)(2), we consider "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement." The undisputed facts show that there was no unreasonable delay by ANR in seeking enforcement. In fact, EEO Lowkes responded to the initial complaint in a matter of days.

We do conclude that particularly Mr. Harrison took some remedial steps that, while not complete, provide some measure of mitigation. In a matter of weeks, he had a contractor do repair work to West Lake Road, the culvert under the road, and the neighbors' lawns. This work not only appeased the neighbors, slightly, but also minimized the further discharge and transmission of silt into the Bay. For this reason, we have fashioned an amendment to ANR's penalty that we hope will provide an incentive for both Respondents to complete the necessary work in a timely manner. Our penalty amendment is detailed at the end of this Decision.

**Subsection (3)**: Under § 8010(b)(3), we consider "whether the respondent knew or had reason to know the violation existed." We conclude that both Respondents knew that the discharge existed and that it was unlawful. Most telling were each Respondents' own admissions that they directed the breach of the beaver dam; their initial statements implied that they did so for a business purpose: draining a quarry test pit for further investigation. Mr. Ruby had some sense of the unlawfulness of breaching the dam, since he initially attempted to explain away the breach by saying the local game warden authorized him to do so. That representation proved to not be true. In fact, the game warden advised EEO Lowkes that he had not even spoken to Mr. Ruby. While the absolute truth of what occurred may never be known, the compelling

12

circumstantial evidence causes us to conclude that Mr. Harrison either operated the excavator that performed the breach himself, or directed an employee to do so.

**Subsection (4)**: Under § 8010(b)(4), we consider "the respondent's record of compliance." The record presented did not show that Respondents had previously violated any applicable laws or rules. We are concerned, however, that after the significant discharge on April 13, 2014, Mr. Harrison saw fit to pump out a test pit in the Mammoth in such a way as to cause another, albeit lesser, discharge down the same intermittent stream and into the lake.

**Subsection (5)**: This subsection has been repealed.

**Subsection (6)**: Under § 8010(b)(6), we consider "the deterrent effect of the penalty." In considering the importance of deterring Respondents from future violations, we note their continued denial of responsibility, even in the face of their own initial admissions and the overwhelmingly strong circumstantial evidence. While Mr. Harrison's initial cleanup efforts are commendable, his trial testimony caused concern that he still did not appreciate the significance of the damage done by this unlawful discharge. For all these reasons, we conclude that the significant penalty imposed by ANR ($12,000.00) is necessary, even though it is significantly above the expenses ANR presented at trial, so as to provide a meaningful deterrent.

**Subsection (7)**: Under § 8010(b)(7), we consider "the State's actual costs of enforcement." We did not receive evidence at trial on the value of the time that all ANR officials committed to responding to Respondents' violations. The evidence we did receive was credible, uncontested testimony on the value of EEO Lowkes's time (totaling $2,006.00) and the Environmental Analyst who credibly testified about the impacts and remedies of Respondents' unlawful discharge ($451.01). We are convinced that these values represent only a fraction of ANR's actual costs, but we have incorporated these identified costs into the total penalty awarded (i.e.: a total penalty of $12,000.00, including costs).

**Subsection (8)**: Section 8010(b)(8) directs us to consider how long a respondent allowed or caused an environmental violation to continue. In the case before us, the discharges only lasted a matter of hours, but the impacts are continuing and will continue until the proper remediation is permitted and completed. As an incentive to encourage Respondents to complete the necessary remediation work in a timely manner, we have modified the original ANR penalty.

13

The penalty will be divided into two parts, with the second part falling due only if Respondents fail to comply with the initial set of deadlines, as detailed below.

## Conclusion

For the reasons stated above, we conclude that Respondents Ruby Construction, Inc. and Royal Harrison allowed, directed, and caused the unpermitted discharges into Lake St. Catherine, a water of the state, in violation of 10 V.S.A. § 1259(a). We therefore **AFFIRM** the legal conclusions rendered by the ANR Secretary and detailed in the November 6, 2015 Administrative Order and do hereby **AFFIRM** the penalty and injunctive provisions in that Administrative Order, jointly and severally against the Respondents, with the following minor modifications:

A. Pay a penalty totaling **$9,000.00** no later than thirty (30) consecutive calendar days from the date of this Merits Decision and Judgment Order. Payment shall be made payable to the Treasurer of the State of Vermont and forwarded to the Administrative Assistant for the Compliance Enforcement Division, Agency of Natural Resources, 1 National Life Drive (Davis 2), Montpelier, VT 05602-3803. In the event that Respondents receive the necessary permit and complete the work by October 31, 2018, no further penalty shall be due. However, if Respondents fail to complete the necessary permitted work by that date, Respondents shall immediately pay an additional fine of **$3,000.00** by October 31, 2018.

B. All deadlines contained in paragraphs (B) through (D) of the Administrative Order, inclusive, shall begin from the date that this Merits Decision and Judgment Order become final (i.e.: the first business day after all appeal rights have been exhausted).

C. Paragraph (E) of the Administrative Order is modified to require that Respondents shall initiate and complete sediment removal in accordance with the approved encroachment permit application between September 1, 2017 and October 31, 2018.

## Rights of Appeal (10 V.S.A § 8012(c)(4)–(c)(5))

**WARNING:** This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received. All parties to this proceeding have a right to appeal this Decision and Judgment Order. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont

Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

A Judgment Order accompanies this Decision. This concludes the current proceedings before this Court.

Electronically signed on July 24, 2017 at Burlington, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division