**VERMONT FOOD INDUSTRIES, INC.,**
**Plaintiff-Appellee,**

v.

**RALSTON PURINA CO.,**
**Defendant-Appellant.**

**No. 519, Docket 74–1823.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 8, 1975.

Decided March 24, 1975.

---

Judith S. Kaye, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City (John Logan O'Donnell, Peter Aron, New York City, Natt L. Divoll, Jr., Bellows Falls, Vt., John M. Schobel, Jr., St. Louis, Mo., of counsel), for defendant-appellant.

David L. Cleary, Richard E. Davis, Associates, Inc., Barre, Vt., for plaintiff-appellee.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a judgment after a special verdict in favor of an egg producer, Vermont Food Industries, Inc., in its suit against the appellant poultry feed manufacturer, Ralston Purina Co. The egg producer's claim was that the feed supplied to it by Ralston Purina in its "Life Cycle Feeding Program" contained an improper nutritional balance, resulting in obesity and "fatty liver syndrome" in appellee's laying hens, thereby reducing egg production and requiring the appellee to purchase eggs in the open mar-

ket in order to supply its various supermarket customers in and about Vermont. Egg production from seven separate flocks, six in Vermont and one in Maine, was involved. Recovery was had for breach of implied warranties of merchantability and fitness for a particular purpose.[1] Judgment was entered in the United States District Court for the District of Vermont, Albert W. Coffrin, *Judge*, in the amount of $298,870 before reduction of a stipulated amount of indebtedness by the appellee to the appellant in the amount of $136,750.84 for feed and chickens provided by the appellant.

On this appeal, Ralston Purina does not put all of its eggs in one basket: it argues that the evidence was insufficient to sustain any verdict for the appellee; that the quantum of damages was so speculative and conjectural that it should not have been submitted to the jury; that the trial court erred in admitting the response of one of appellee's several expert witnesses, Dr. Edmund Hoffman, to a hypothetical question which it is argued lacked proper foundation in ·the record; and that it was error to exclude proof offered by the appellant as to the absence of similar complaints over a five-year period during which it had annually sold approximately a million tons of chicken feed that it claimed conformed to uniform nutritional standards. We affirm the judgment.

## I. THE SUFFICIENCY OF THE EVIDENCE

Ralston Purina, the "largest poultry feed manufacturer in the world" (Appellant's Brief at 1), after certain field tests and research over a period of three years, substituted the so-called "Life Cycle Program" for its previous feed program for laying hens, nationally in March and April of 1971. The purpose of the new feed program, as testified to by the general manager of Ralston's General Poultry Research Department, Dr. David Snetsinger, was to reduce "ingredient cost without sacrificing performance," this being done by lowering protein levels and using better balanced amino acids and some synthetic vitamins.

The effectiveness of a feed program for chickens is related to three factors: protein level, energy (calorie) content, and amino acid balance. Much simplified, the key to the Ralston Purina program was, according to its experts, reducing protein levels while providing a new amino acid balance. The "Life Cycle" program, for example, had four phases. A starter feed with 18 per cent minimum guaranteed protein was fed to chicks from 0 to six weeks of age; a "Growena No. 1" feed with a minimum protein guarantee of 15 per cent was fed during the six to 12 week period of development; and a "Growena No. 2" feed with a minimum 12 per cent guarantee was fed to pullets from 12 to 20 weeks of age.[2] This was then followed by a laying ration which called for 14 per cent protein.[3]

From an economic point of view, the key to the hoped-for effectiveness of the appellant's Life Cycle program was that it could reduce the expensive protein content in the feed while a proper amino acid balance was maintained.[4] Since

---

[1] U.C.C. §§ 2-314, 2-315, 9A Vt.Stat.Ann. §§ 2-314, 2-315 (1966).

[2] At 20-22 weeks pullets generally begin to lay eggs.

[3] Testimony indicated that, after a while, appellee's chickens were fed a 15 per cent protein feed, what was in effect a "special mix."

[4] The importance of the amino acids to the egg production of a chicken was explained by the appellant's expert, Dr. Nesheim.

A chicken only has to put 6 grams of protein into an egg, and yet she takes in 15 or 16 grams of protein to produce the egg, and one of the reasons that the hen has to consume more protein than she puts into the egg is the amino acids that are required to produce the egg have got to be in this protein in the proper amount in relation to the egg protein that she is making, and so if you can supply the amino acids in a diet in a ratio in such proper proportion that the egg protein can be made more favorable than the total amount of protein that is taken in, becomes relatively unimportant compared to the balance of amino acids that the diet has got to have.

(A286.)

some amino acids can be supplied synthetically (and relatively inexpensively) the feed would therefore be more economical. As Dr. Snetsinger put it, "By furnishing more amino acids to the protein content of the ration, we come up with a less costly production of a dozen eggs." A potential side effect of the low protein content of the feed, crucially at issue here, was that there would be a corresponding increase in the caloric or "energy" content of the feed. A high energy-low protein feed without a proper amino acid balance did, appellee's evidence indicated, result in lowered egg production, small egg size, and excessively fat birds, with fatty livers.

The appellee, a LeRiche family corporation, which started using the appellant's "Life Cycle" feed in the latter part of 1971, had three modern egg producing buildings in Vermont, Complexes "A," "B" and "C," and another reconstructed building, called the Homosote house. The Homosote house housed a flock which were sister birds to those in Complex B in 1972. The "Homosote flock" was referred to throughout the trial, at least by appellee's experts, as a control flock because while the conditions and environmental factors of both the Homosote house and the new complexes were identical for all practical purposes, the Homosote flock was on feed supplied by the Pease Grain Co. of Burlington, Vermont. That Pease feed contained a higher protein level (18 per cent minimum) and hence lower caloric level than the feed supplied to the other birds in the A, B and C complexes. The appellee

also had a flock in Maine, the "Dostie" flock, started on the appellant's feed program in late 1970.

The appellee's proof concerned seven flocks which were identified according to the laying house complex which they occupied: Flocks A–1 and A–2 were of different genetic strains but in the A house at the same time; B–2 and C–2 respectively succeeded flocks B–1 and C–1; however, flock C–1 having completed its laying cycle had been sold for meat. These were the six Vermont flocks.[5] Flocks B–2 and C–2 were the only flocks in issue fed the Life Cycle feed from the time they were hatched. Various nutritionists and veterinarians at the University of Vermont and the University of Connecticut diagnosed the birds in these flocks as being obese and having fatty liver syndrome, which is associated with low egg production. The contrast between the B–2 flocks and the Homosote or control flock borne out by the production records was rather remarkable and perhaps the heart of the appellee's case. The B–2 birds and the Homosote birds were both baby chicks together and grown together, hence "sister" birds. The B–2 birds were fed the appellant's feed with a 15 per cent minimum protein tag while the Homosote birds were fed the 18 per cent protein feed supplied by the Pease Co. Both groups of birds were housed at the same time, and they looked equally good at that time.

Subsequently the B–2 birds not only looked extraordinarily fat but several

---

Dr. Nesheim went on to describe how an imbalance in amino acids would affect a chicken.

In growing chicks a mild, partial deficiency of protein or of one of the essential amino acids results only in decreased growth, in direct proportion to the degree of deficiency. Since protein level must be expressed in terms of the energy content of the diet, a protein deficiency may also be called an excess of energy. Thus, . . . a protein deficiency causes an increased deposition of fat in the tissues due to the inability of the chicken to make productive use of the energy because the diet does not contain sufficient protein or amino acids for optimum

growth or production. Thus, the animal must convert the extra energy into fat.

5. The appellee's claims as to each flock are presented in the following table:

| Flock Number | Period of Damages | Amount Claimed |
|---|---|---|
| A–1 | April 1971–April 1972 | $ 15,216.03 |
| A–2 | June 1971–May 1972 | 48,246.08 |
| B–1 | July 1970–Aug. 1971 | 30,430.61 |
| B–2 | May 1972–Feb. 1973 | 71,717.05 |
| C–1 | Jan. 1971–Feb. 1972 | 68,927.40 |
| C–2 | July 1972–July 1973 | 80,060.26 |
| Dostie | Oct. 1971–Sept. 1972 | 22,167.31 |
| (Maine flock) | | $336,764.74 |

autopsies showed them to be grossly obese, excessively fat and slippery, and greasy to handle. They had what was described by appellee's experts as fatty liver syndrome, that is, varying degrees of fattiness of the liver and other organs, together with very low egg production. A chart kept of the production of the B–2 birds from April, 1972, until they were sold at the end of February, 1973, the chart being an H & N "Nick Chick" performance goal chart,[6] showed that the production of these birds was well below even the minimal goals set by the chicken breeders, peaking at a high of 67 per cent hen day average egg production when it should have peaked at about 84 per cent, and running approximately 20 to 25 per cent below anticipated production. A similar chart kept on the Homosote birds, however, showed them to peak above the minimum performance on the goal chart at 85 per cent and consistently to run, with only one or two weeks' exceptions, at or above the minimum performance levels throughout their breeding life and indeed an additional two months beyond the time at which the B–2 birds were sold. Appellee's attempts to explain this difference in performance away on environmental conditions were refuted by witnesses who were familiar with the appellee's premises,[7] one of whom was an extension agent who had directed the installation of the cages, the feeders, egg gathering belts, ventilation systems, in the A, B and C complexes. In short, the record rather conclusively demonstrates by virtue of the control flock that appellant's feed consistently resulted in obese birds with fatty liver syndrome and 20 to 25 per cent lower egg production than the minimum performance goals.[8]

As testified to by Dr. Bryant, see note 8 supra, there was definite evidence that fatty liver syndrome was accompanied by "lowered egg production. This is accepted now in the field." There was, moreover, ample evidence that there was no cause for fatty liver syndrome other than "too many calories, too much energy calories, too high energy intake." "If the feed is the only source of calories, that's the only place where it can come from."

Charts kept by appellee indicated as to all of the other flocks that the egg production was consistently 20 or 25 per cent lower than the minimum performances expected in the trade. Pathology reports from the University of Vermont as to flock C–2 (DeKalb Leghorns) showed low production and evidence of fatty liver syndrome in six out of six specimens (Ex. 36) and fatty liver syndrome in five out of five birds (Ex. 39). This was confirmed by a contemporaneous examination of three birds at the University of Connecticut, all of them being described as very fat, with yellow friable livers evidencing hemorrhages and numerous fat cells replacing liver cells.

Specimens from the Dostie flock in Maine were examined at the University

---

**6.** The H & N chart, developed by Hisdorf Nelson, a large breeder, is in effect a production chart showing a range of normal egg production over a period of time.

**7.** There was ample evidence from which the jury could find that the appellee's facilities were well managed and that ventilation, water and other factors were very good at all times. Disease and other external production factors were also essentially eliminated by appellee's expert and other witnesses, although it is also obvious from a reading of the record that chickens are subject to a great variety of diseases, from some of which appellee's were not immune.

**8.** Dr. Everett Bryant, the Extension veterinarian of the College of Agriculture and Natural Resources at the University of Connecticut, who did autopsies on several birds from both B–2 and Homosote flocks, indicated that the birds from the B complex were all excessively fat and had fatty liver syndrome, whereas the Homosote birds with only one exception had a normal pathology. Dr. Bryant testified that as to the B complex birds,

[T]he striking thing was the abdomens were very full of fat, and at the autopsy, as we opened them up, the fat in the body cavity just sort of plunged out toward me . . . I, personally, consider this a nutritional problem . . . the birds were quite greasy and the liver was yellow, and that sort of thing, and it just sets all the criterion for the diagnosis which, in this case, was fatty liver syndrome.

of Maine by Dr. Harold Gibbs, and while a number of its birds had Marek's disease, a form of poultry cancer, he also found fatty liver syndrome in six birds on March 16, 1972, out of the ten white Leghorns examined (Ex. 58), and on August 14, 1972, the University of Vermont pathologist found ten of eleven of the Maine birds in their tenth month to have moderate excessiveness of fat and one extremely fat with yellow liver (Ex. 38). Thus there was hard evidence of fatty liver syndrome in flock C–2 and the Dostie flock.

Appellant argues that there was not any direct evidence that the A–1 and A–2 flocks and B–1 and C–1 flocks were diagnosed on autopsy or otherwise as being excessively fat or having fatty liver syndrome. Appellant accordingly labels them as the "phantom flocks," as if to argue that there was therefore no proof that they had low egg production from eating its feed. But significantly, as early as June 9, 1971, Dr. Murray from the University of Vermont had reported that 10 white birds from the Vermont flocks had an "excess fatty condition" at 23 weeks of age (Ex. R). All of these birds were fed the appellant's feed, and their egg production was well below what could otherwise normally have been expected as the minimum. They were all good plump birds with shiny feathers and nice red combs, at least as testified to by Mr. LeRiche. But after they were started on the Life Cycle feed of appellant's, they all became fat and low producers.[9]

It is undisputed that 20 to 30 per cent lower production was sustained by these flocks, a condition which is consistent with fatty liver syndrome. When it came to the attention of appellant's own Dr. Snetsinger that there was fatty liver syndrome in appellee's flocks B–2 and C–2, he recommended that the protein in the Purina feed be increased from 15 per cent to 18 per cent, and he did this for the specific purpose of lowering the energy or caloric content in his company's feed.

We believe that there was sufficient evidence to permit the jury to draw the inference that appellant's feed caused excess obesity and hence low egg production in all of appellee's flocks. This was an inference, to be sure, at least in respect to the "phantom flocks," so-called, but the striking combination of low egg production and the use of appellee's feed provided a sufficient basis for this inference. Even the appellant's own expert on nutrition conceded that laying hens normally need 17.5 to 18.5 per cent protein ratio. He argued, and was supported by Dr. Hoffman, that this can be reduced if the amino acid balance is proper. But the evidence was that if the amino acids are imbalanced in a low protein diet there may result both a loss in egg production and small egg size. Long before by autopsy and otherwise it was established that the B–2 and C–2 flocks had fatty liver syndrome, LeRiche was complaining about *both* production loss and small egg size in the so-called "phantom flocks." Dr. Snetsinger also testified that in a book he had written he had warned that protein levels below 14.5 per cent were *not* recommended because at those lower levels the amino

---

9. Mr. LeRiche testified about the birds as follows:

Q. Is it fair to say that after the starting of the new feed that that is the first time you noticed that the birds were fat and not producing?
A. Right. This is where this whole thing came about then.
Q. This was after the L.C. [Life Cycle]?
A. After the L.C. Feed got started and we went on to this, yes.
Q. So to the best of your knowledge, prior to the L.C. Feed you don't know whether these birds were fat?
A. No, I don't.

Q. But after the L.C. Feed, you had the opportunity to observe that they were fat and the production was low?
A. Right.
Q. Is that true of all the flocks, that were in the "A," "B," and "C" buildings and in Maine?
A. Yes, they were all the same feed. They were all the same thing.
Q. This is after the L.C. Feed?
A. After the new feed program was started, the production seemed to get very, very low. The production, some times, seems to me was ridiculous low.

acid ratios can become imbalanced. The appellant had ample opportunity to explain that the amino acid balance in its feed was proper, even though from the appellee's evidence the jury could have inferred the contrary. But just what the amino acid balance consisted of or why it was proper never was put into evidence because appellant considers that balance to be a trade secret which it refuses to reveal.

Thus the jury was left with the inference that in the new low protein feed furnished by appellant there was too high a proportion of energy or calories that was not sufficiently compensated for by a proper amino acid balance. The fact that this was a relatively new feed and that only limited field tests had been done by the appellant may have contributed to the inference, but the inference is nevertheless there, plain and unmistakable.

Appellant attempted to show, unsuccessfully, that some of appellee's losses were caused by bad management. Appellant also attempted to show that some of the cause of appellee's losses were due to other diseases or in fact, at least in connection with the C–1 and Dostie flocks, a partial substitution of other birds; 4,000 out of the 32,000 birds in the C–1 flock were replacement birds,[10] and 5,980 birds were added to the Dostie flock. We may conclude that the jury took into account that some of the hens in the C–1 and Dostie flocks were replacement birds in reducing the damage claim from in excess of $336,000 to $298,-000. There was, as we have said, clear evidence that the Dostie flock showed evidence of fatty liver syndrome in March of 1972. There was ample evidence from Drs. Hoffman, Murphy and Bryant that there was no significant disease problem with the appellee's birds (except as to the birds replaced in the flocks in question).

The appellant's own Dr. Snetsinger testified that he knew that brown birds had a definite tendency to overeat and thus, because the Vermont complexes had large numbers of brown birds the problem was exacerbated. But it must be noted that the Homosote birds which did produce well and which did not get fat on the Pease grain were also brown birds—a strain of the familiar breed known as Rhode Island Reds.

In short, the appellant's claim of insufficient support in the evidence fails, we think, as to each of the flocks. That is to say, there was sufficient evidence as to defect and causation to raise a question for the jury. The jury simply did not accept appellant's claims and cast aside the contention that the evidence was equivocal as to the cause of disappointing production rates, including the contention that what it calls the phantom flocks were not plump on appellant's low protein feeds at the time they went into the laying houses.

▪ The applicable Vermont case law is that direct proof is not necessary to establish a breach of implied warranty of merchantability or of fitness for a particular purpose. Patton v. Ballam & Knights, 115 Vt. 308, 58 A.2d 817 (1948). As the Vermont Supreme Court there stated, "Circumstantial evidence may be resorted to, and such evidence will be sufficient to justify the verdict below, if there can be drawn therefrom the rational inference that the defendant's [product] . . . was the source of the trouble." 115 Vt. at 314, 58 A.2d at

---

10. Appellant's contention that Flock C–1 cannot be considered because 4,000 birds, about 10 per cent of the flock, were received from a hatchery at 20 weeks to replace cancerous birds in that flock is based upon the argument that these birds laying at a reduced rate, as they must have because they were just coming into the laying cycle, would have brought down averages for the entire flock. Young birds peak, however, within a matter of seven or eight weeks after coming into production.

The University of Vermont Extension Service specialist, Mr. Mercia, testified that if chickens were put into production at 20 weeks instead of 22 weeks, "We would expect a slight decrease in the number of eggs during the period." From this it would be inferred that the 20-week-old chickens in the C–1 flock would have resulted in only a negligible decrease in production. Moreover, the production cycle of birds is 12 or 13 months, so that this lowered production was also temporary.

821; Boguski v. City of Winooski, 108 Vt. 380, 187 A. 808 (1936). *See also* Ralston Purina Co. v. Jungers, 86 S.D. 583, 199 N.W.2d 600 (1972) (in action by feed company against farmer to recover on a note, where evidence showed that cattle were healthy when farmer commenced feeding Ralston Purina "Complete Cattle Chow" and subsequently showed high incidence of liver disease, held, sufficient evidence to prove breach of warranty of quality and fitness).

## II. EXPERT TESTIMONY

■ Appellant's second claim of error is based on the hypothetical question asked of and answered by Dr. Hoffman relative to flocks A–1, A–2, B–1 and C–1, the "phantom" flocks. The question was as follows.

Now assume, as Mr. LeRiche has testified, that the birds, when housed back in 1971, had shiny combs, shiny feathers, and were plump, and assume further that the feed program that they were on in the flocks, which we will demonstrate were on the same program as the birds were in 1972, and assume further that the low production results which were achieved, or not achieved, in 1971 were consistent with the low production in the flocks in 1972 [and assume further that there were no disease factors which would seriously adversely affect production], do you have an opinion as to whether or not the cause of the poor production is the same? [11]

Dr. Hoffman answered in the affirmative and added that the facts were consistent with the diagnosis that the A–1, A–2, B–1 and C–1 flocks became too fat as a result of over-consuming energy contained in the feed.

Appellant argues that there was no foundation for this hypothetical question. But there was the uncontradicted testimony of Mr. LeRiche that the birds looked the *same* as the birds later diagnosed to have fatty liver syndrome, and there was testimony that almost from the time that the birds started on appellant's feed, Mr. LeRiche had complained to the Purina serviceman and others about the flocks in his new complexes A, B and C. In addition, there was the report of Dr. Murray from the University of Vermont, made on June 9, 1971, which showed that the Vermont flocks had an excess fatty condition at 23 weeks of age. All of this evidence provided the necessary foundation for the hypothetical question presented to Dr. Hoffman and the inference in the evidence.

■ In asking a hypothetical question, the examiner may seek the witness's opinion on "any combination of facts within the tendency of the evidence." Marsigli v. Granite City Auto Sales, 124 Vt. 95, 197 A.2d 799 (1964). The sufficiency of the assumptions as well as the soundness of the opinion can be tested on cross-examination. *See* 2 J. Wigmore, Evidence, §§ 682–86 (3d ed. 1940).[12] Here there was sufficient basis for the question that was asked.

## III. DAMAGES

■ In connection with the appellee's claim of damages, the appellant argues that the evidence relating to lost profits was inadequate and that the issue should never have been submitted to the jury. Specifically, the appellant argues that the Goal Performance Charts should not have been used to establish the plaintiff's damages, but that any proof of

---

11. The question as presented in the text is slightly reconstructed, it was asked in two parts, with the bracketed portion of the question added after colloquy at the bench.

12. 12 Vt.Stat.Ann. § 1643 provides as follows:

An expert witness may be asked to state his opinion based on the witness' personal observation, or on evidence introduced at the trial and seen or heard by the witness, or on his technical knowledge of the subject, without first specifying hypothetically in the question the data on which this opinion is based. On direct or cross-examination, such expert witness may be required to specify the data on which his opinion is based.

*See generally* Bean v. Sears, Roebuck & Co., 129 Vt. 278, 276 A.2d 613 (1971); Bliss v. Moore, 112 Vt. 185, 22 A.2d 145 (1941); Fed. Rules Ev. §§ 701–05.

damages should instead have been linked to the appellee's prior years of performance. In effect, the claim is that the use of the charts was too speculative to be of value.

There was, however, unrefuted evidence that the minimum goals presented in the charts were readily attainable levels of production. In addition, there was sufficient testimony that appellee managed his operation well and, perhaps most importantly, there was the fact that the Homosote flock fed on Pease Co. grain met the production curves. Accordingly, we hold that the basis for computing damages was adequate.

■ Appellant also presents the additional argument that the amount of damages should have taken into account the possibility of mechanical failures. In connection with this claim, much emphasis is placed on Mr. LeRiche's statement that "Sometime, mechanical failure happen and you get 100 eggs that goes on the floor. . . ." But we are talking here about egg losses of approximately 800,000 dozen, so that a few mechanical failures, conceded by Mr. Le-Riche, are hardly significant. Appellee produced ample evidence that its methodology employed in collecting and accounting for eggs was a good one, well within acceptable management standards; the amount of egg breakage was consistent with and not greater than that of other producers. We have to take that evidence in the light most favorable to appellee.

In short, this was a complex case from the factual point of view on which the appellee's four theories of action [13] were reduced to only one, breach of implied warranty, as to which the jury returned a verdict which reduced by more than 11 per cent the amount it could have found on the evidence. We think this reduction can be explained on the basis of a number of the points that appellant raises for upsetting the appeal as a matter of law.

## IV. THE ABSENCE OF SIMILAR COMPLAINTS

The appellant's one other point of moment is that the court below erred in excluding evidence as to the absence of complaints by other poultry producers as to the appellant's feed. Appellant offered proof that it has sold 1 million tons of feed annually. It must be understood, however, that in the feed manufacturing business the makeup of a given supply varies with local conditions, the availability of proteins, expense and the like. In other words, corn, wheat and other protein foods are used from time to time, depending on availability, locality and cost. That is to say, the ingredients change as much as weekly, but they are supposed to remain within certain parameters of protein content, amino acid balance and other nutritional specifications. There was some evidence that in the Northeast the way feed ingredients are priced, the manufacturers tend to promote high energy diets, which when they work are to the farmer's advantage because his costs are lower. In the light of these many variables, the relevance and probative value of evidence regarding an absence of complaints is substantially diminished.

■ As we have previously said in Fortunato v. Ford Motor Co., 464 F.2d 962, 967 n. 1 (2d Cir.), cert. denied, 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972):

It is highly questionable whether evidence showing the absence of any similar complaints would be admissible in this case, which was primarily one of a breach of warranty, because the plaintiff withdrew any reliance on a negligence theory during trial. A breach of warranty gives rise to strict liability which is not necessarily negated by a showing of due care or a lack of knowledge of the defect on the part of the manufacturer or seller, Blessington v. McCrory Stores Corp., 305 N.Y. 140, 111 N.E.2d 421 (1953); W.

---

13. Appellee's original suit alleged breach of warranties of merchantability and fitness for

particular purpose, breach of express warranties, misrepresentation and negligence.

Prosser, The Law of Torts, § 95 at 652 (3d ed. 1964). Therefore, evidence of a lack of prior complaints is rarely probative on the warranty issue, *see* Frank R. Jelleff Inc. v. Braden, 98 U.S.App.D.C. 180, 233 F.2d 671, 677–80 (1956).

*See also* S. J. Van Lill Co. v. Frederick City Packing Co., 155 Md. 303, 141 A. 898 (1928); McCormick, Evidence at 600–01 (2d ed. 1972).

■ But even were we to accept the appellant's general position that evidence demonstrating an absence of similar complaints should be admissible, the specific offer of proof made here was simply not relevant to the issue before the jury. That offer consisted of three questions presented to its manager of "chow complaints" at the company's general headquarters in St. Louis. He had testified that if no decision or resolution could be made by the appellant's local or regional serviceman or salesman a complaint would come to him. The three questions to which he would have answered in the negative were "whether any complaints in relationship to the formulation of the LC program Layena was [sic] filed with you?" "Have you received poultry feed samples on complaints involving the nutritional standards of poultry chows?" and "Have you received poultry feed samples on complaints involving Purina's poultry program?" But none of these questions was probative of the real point the appellant was trying to get before the jury, namely, that no complaints concerning the appellant's product had in fact been made. Many complaints might have been made locally, but resolved there. In other words, the absence of formal complaints at the home office might not be indicative of the situation in the field.

There are at least two other reasons for excluding the testimony. There was evidence that the final mix at 15 per cent protein level was a special mix fed only to appellee's hens so that an absence of showing of complaints as to other mixes could have been meaningful only if there had been a comparison of amino acid contents and balances in the regular feeds. In addition there was some indication that poultry farmers such as the appellee are dependent upon feed companies for supplies and credit; it could well be that an individual farmer would not like to run the risk of cutting off his feed supply or the making of demands upon his credit by complaints about low production to the self-styled largest feed manufacturer in the world.

Judgment affirmed.