Vermont Superior Court
Filed 01/05/26
Washington Unit

| | | |
|---|---|---|
| VERMONT SUPERIOR COURT<br>Washington Unit<br>65 State Street<br>Montpelier VT  05602<br>802-828-2091<br>www.vermontjudiciary.org |  | CIVIL DIVISION<br>Case No. 247-7-20 Wncv |

**Hayek Medical Devices (North vs. State of Vermont**

## ENTRY REGARDING MOTION

Title:　　　　Motion for Summary Judgment; Motion for Summary Judgment; Motion to Clarify; Motion for Status Conference ; (Partial Motion for Summary Judgment on Liability); the Record; to Simplify the Issues and Aid in the Disposition of the Case (Motion: 34; 36; 43; 44)
Filer:　　　　Neil F.X. Kelly; Neil F.X. Kelly; Kendall Alison Hoechst; Neil F.X. Kelly
Filed Date:　　April 11, 2025; May 30, 2025; October 16, 2025; December 12, 2025


The motion is GRANTED IN PART and DENIED IN PART.



　　　　The present dispute involves a question of suitability and timely rejection of goods arising from the emergency purchase of medical equipment by the State of Vermont on behalf of hospitals during the early and chaotic days of the COVID-19 pandemic.  Specifically, it poses the question of whether negative pressure ventilators were fit for the purpose of treating individuals with COVID-derived respiratory conditions.  It also concerns the implementation of draconian penalty provisions added at the last minute to a contract.

**Background Facts**

　　　　In March of 2020, during the initial throes of the pandemic, decisionmakers in state government and the healthcare industry anticipated that Vermont would experience a dramatic surge in the need for ventilators, far outstripping existing inventory or what could be easily imported from nearby resources.  Plaintiff Hayek Medical Devices (North American) LTD., a foreign business, advised the State that it could supply Vermont's expected ventilator needs.  This solicitation led to a meeting between agents from Hayek and agents from the State (including private medical professionals working with the State).  The State initially sought to purchase 1,000 ventilators, but Hayek could not supply that volume.  Instead, following this

1

meeting, the State ordered 25 ventilators, which was later raised to 50 when Hayek determined it had additional, available supplies.

Shortly after this agreement, Hayek began fulfilling the order and shipping out ventilators. On April 22, 2020, Dr. Mark Hamlin, then Medical Director of Respiratory Care Services at the UVM Medical Center (and an advisor to the State regarding ventilator needs), took the position that positive pressure ventilators were the "best care we could provide." Since the Hayek ventilators were negative pressure ventilators, he stated that "[u]nder no circumstances would I approve use of one of these [Hayek negative pressure] devices over any invasive ventilator." Affidavit of Mark Hamlin at 5 (filed April 11, 2025). The State quickly started taking steps to cancel the contract with Hayek and refused subsequent shipments. It has never paid anything to Hayek, which promptly filed this suit in July 2020 claiming breach of contract.

**Pending Motions before the Court**

The parties have filed cross-motions for summary judgment addressing the issue of liability on Hayek's breach of contract claim. The State, in its defense, claims that it has no liability because the ventilators provided violated the warranty of fitness for a particular purpose in that Hayek knew that the State needed them to treat COVID patients, and they were useless for that purpose. The State also argues that Hayek breached the contract by supplying nonconforming goods because the ventilators were useless for the intended purpose. In the alternative, the State contends that the contract should be declared void due to either mutual mistake, specifically the allegedly mistaken belief that the ventilators could be used to treat COVID patients, or misrepresentation because of the representation that the ventilators could be used to treat COVID patients.

Regardless of how these positions are framed, the State's arguments all point to the same fundamental question: whether Hayek's ventilators could be used to treat an appreciable number

2

of COVID patients or were, in the State's parlance, "useless." That is the essential question presented as to liability.[1]

The extent of the damages, if the State has liability, is not currently before the court on summary judgment, but the parties also have raised the question in their briefing of whether, as a matter of law, the terms of the contract include an 85% penalty provision for "late" cancelations.

Finally, the State also has filed what it has styled a motion to clarify the record. During summary judgment briefing, it became clear that the State was relying on expert opinion testimony of Dr. Hamlin on the issue of whether Hayek's ventilators can be used to treat COVID patients. Otherwise, it relies almost exclusively on the testimony of Hayek's own experts to demonstrate a lack of fitness. Prior to this last filing, the State had never disclosed Dr. Hamlin as an expert. Hayek argues that by the time this issue bubbled up, it was too late because the deadline for disclosure in the scheduling order had elapsed. The State, on the other hand, takes the position that there is no currently applicable deadline for its disclosure of experts. Based on these arguments, the Court understands that the "clarification" sought by the State concerns the proper interpretation of the existing scheduling order and its implications on the State's disclosure of experts.

I.      *Procedural standard*

Summary judgment procedure is "an integral part of the . . . Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Morrisseau v. Fayette*, 164 Vt. 358, 363 (1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Summary judgment is appropriate if the evidence in the record, referred to in the statements required by Vt. R. Civ. P. 56(c), shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. V.R.C.P. 56(a). Summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial. *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994). The court derives the undisputed facts from the parties' statements of fact and the supporting documents. *Boulton v.*

---

[1] This is also precisely the same question raised by Hayek's arguments in its motion for partial summary judgment, and is, in fact, the central question of liability in this case as all other essential elements of contract formation and initial delivery were met.

3

*CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 29. A party opposing summary judgment may not simply rely on allegations in the pleadings to establish a genuine issue of material fact. Instead, it must come forward with deposition excerpts, affidavits, or other evidence to establish such a dispute. *Murray v. White*, 155 Vt. 621, 628 (1991). Speculation is insufficient to establish a dispute of material fact or to carry a burden on which a party seeks judgment. *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375.

II.    *Liability*

The principal liability question is whether Hayek's negative pressure ventilators could be used successfully for at least some appreciable population of COVID patients or, in other words, whether they were fit for that particular purpose. The parties agree that the contract, which is between parties doing business in different signatory countries to the United Nations Convention on Contracts for the International Sale of Goods, is subject to the Convention. U.S. Ratification of 1980 United Nations Convention on Contracts for the International Sale of Goods: Official English Text (Mar. 2, 1987), 52 Fed. Reg. 6262-02, 1987 WL 128849. The Convention "provides an effective solution for this difficult problem [of uncertainty as to what law applies to international contracts for the sale of goods] by providing uniform rules to govern the questions that arise in the formation of international sales contracts, and the rights and obligations of the buyer and seller in performance of the contracts." Annotation, *Construction and Application of United Nations Convention on Contracts for the International Sale of Goods*, 200 A.L.R. Fed. 541, § 2[a]. The Convention is similar in many respects to Article 2 of the Uniform Commercial Code. See 9A V.S.A. §§ 2–101 to 2–725. "Caselaw interpreting analogous provisions of Article 2 of the [UCC] may . . . inform a court where the language of the relevant [Convention] provisions tracks that of the UCC." *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995).

> Article 35 of the Convention provides, in relevant part:
> (1)    The seller must deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract.
>
> (2)    Except where the parties have agreed otherwise, the goods do not conform with the contract unless they:

.    .    .

4

(*b*)    are fit for any particular purpose expressly or impliedly made known to the seller at the time of the conclusion of the contract, except where the circumstances show that the buyer did not rely, or that it was unreasonable for him to rely, on the seller's skill and judgement;

Convention Art. 35. Section 2(b) is analogous to UCC § 2–315: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." 9A V.S.A. § 2–315.

"The essential elements of a warranty of fitness for a particular purpose are that the seller be apprised of the intended use of the product and that the buyer rely upon the skill and knowledge of the seller in the selection of the product." Plaintiff's Proof of a Prima Facie Case § 3:4; see also 1 White, Summers, & Hillman, Uniform Commercial Code § 10:36 (6th ed.). "The warranty is breached if the product is in fact unsuitable for the use intended by the purchaser." Plaintiff's Proof of a Prima Facie Case § 3:4. "The burden is upon the buyer to prove a breach of warranty of fitness for a particular purpose by evidence that the goods were not in fact suitable for the purpose stated by the buyer and that he or she relied upon the skill and knowledge of the seller. The degree of particularity as to fitness for a stated purpose depends upon the nature of the article and its general purpose." *Id*. § 10:37; see also 1 White, Summers, & Hillman, Uniform Commercial Code § 10:37 (6th ed.) ("In most cases, the buyer discloses the purpose in the early negotiations, but the disclosure must be reasonably explicit if a seller would not otherwise reasonably know of the purpose.").

A. *Fitness for a Particular Purpose in March 2020.*

Fitness is the principal factual dispute in this case, but fitness must be gauged by the particular purpose at issue. In that regard, what that purpose was is as important as what it was not. As the undisputed facts demonstrate, Hayek, in light of the shortage of ventilators anticipated due to COVID, reached out to the State indicating that it could supply ventilators. It is undisputed that at a meeting on March 19, 2020, agents of Hayek met with designated agents of the State to make the pitch that the State could successfully use Hayek's ventilators on COVID patients suffering from acute respiratory distress syndrome (ARDS). That generally

5

stated purpose was what everyone at the time understood to be the particular purpose for the ventilators.

## B. Re-casting the Purpose

Many of the disputes in this case concerning fitness appear to be an effort to improperly recast the State's particular purpose. In that regard, it bears noting that while Hayek openly concedes that it knew the State's need was for ventilators that could treat COVID patients with ARDS, there is no evidence whatsoever that the State ever informed Hayek, or that Hayek should have known, that the more specific purpose the State had in mind was ARDS treatment exclusively with positive pressure ventilation.[2] In fact, this more specific condition did not emerge until April of 2020 when Dr. Hamlin informed the State of his opinion and position.

## C. Hayek's Expert Testimony

Hayek's position, which is supported by the testimony of its experts, is as follows. Negative pressure ventilation, when it can be used successfully, is preferable to positive pressure ventilation because it avoids the risk of harm that positive pressure ventilation presents. ARDS can be caused by numerous diseases, among which COVID is but one. Hayek's ventilators have been used successfully to treat ARDS from non-COVID sources. There is nothing unique about ARDS resulting from COVID sources. Therefore, negative pressure ventilation systems can be used to treat ARDS from COVID. As to the differences between positive and negative pressure systems, the differences do not constitute insurmountable issues, except in certain circumstances. For example, one difference between negative pressure and positive pressure systems is whether the machine provides supplemental oxygen. Hayek's ventilators do not provide supplemental oxygen on their own, but if the patient needs supplemental oxygen, it can be provided from a separate source in conjunction with Hayek's ventilator. Similarly, if any measurements need to be monitored beyond the capabilities of Hayek's ventilators, other devices can be used to do so while continuing to use Hayek's ventilators. It is only if intubation becomes necessary or something else counsels in favor of the need for positive pressure ventilation, would the differences become critical. In such cases, it would be appropriate to use a positive pressure

---

[2] This would include treatment by a device that included its own supply when supplemental oxygen was needed, treatment that could be used with intubation when necessary, etc.—all qualities of the positive pressure ventilators.

ventilator or substitute one for a negative pressure ventilator. In other words, while it would be reasonable to anticipate cases in which Hayek's ventilators would be inappropriate, they are not categorically inappropriate to treat ARDS cases. In fact, there is evidence that they have been successfully employed to treat ARDS. Therefore, in March of 2020, there was no basis or understanding to conclude that Hayek's ventilators lacked fitness for the purpose of treating COVID patients with ARDS. Only if the patient's condition changed to a point requiring intubation or positive pressure ventilation would the Hayek's machines be inappropriate.

### D. The State's Response

In its motion and opposition, the State primarily uses the testimony of Hayek's experts in an effort to support the State's argument that the ventilators were not fit for the purpose of treating COVID-derived ARDS. This effort fails to create an issue of material fact principally for two reasons.

First, the testimony of Hayek's experts, fairly read and in context, is consistent with Hayek's larger position and the central issue for liability—that negative pressure ventilators are appropriate to treat a significant number of COVID-derived ARDS cases. None of the experts or their testimony support the proposition that Hayek's ventilators cannot be used to treat COVID patients with ARDS. And with one exception, the State neither contends nor demonstrates that Hayek's experts are not competent to testify as experts or that their opinions are manifestly unreliable.[3] The State does repeatedly dispute testimony of Gary Mefford, a registered respiratory therapist, because he is not a physician and, ostensibly, only a physician could understand the ventilator and its appropriate use. That naked objection is insufficient to disregard Mr. Mefford's testimony, which is premised on his familiarity and experience with the use of Hayek's ventilators. 29 V. Gold & C. Wright & A. Miller, Fed. Prac. & Proc. Evid. § 6264.1 (2d ed. 2025 update) (noting that Rule 702 allows for qualifications of witnesses on the basis of knowledge, skill, and experience). The nature of Rule 702 is that different experts may offer an opinion on an issue deriving from their specific area of expertise. V.R.E. 702. Whether

---

[3] Other than the ultimate fact, that the ventilators can be used to treat COVID patients with ARDS, the State does not assert that any representative of Hayek ever made any false statement about anything at the March 19 meeting or in deposition testimony.

Mr. Mefford's testimony is in and of itself contested, however, his opinions are entirely consistent with Hayek's other experts.

Second, to the extent that the State points to Hayek's experts' testimony as insufficient to demonstrate fitness (for any number of reasons), it misconstrues the burden of proof. As noted above, the burden of proof as to fitness is on the State as buyer who asserts that the products were properly refused, not on Hayek as seller. Plaintiff's Proof of a Prima Facie Case § 3:4; see also 9A V.S.A. § 2-315 (framing the claim of fitness for a particular purpose as a warranty claim on which seller bears risk but buyer must prove); *Vermont Food Industries, Inc. v. Ralston Purina, Co.*, 514 F.2d 456, 458, 462 (2d Cir. 1975) (finding that buyer could meet its burden to establish breach of warranty for fitness for a particular purpose through direct or indirect evidence). Hayek did not have to come forward with evidence proving fitness. The State has had the burden to come forward with evidence of a lack of fitness.[4]

### E. Dr. Hamlin's Expert Opinion

This burden of proof issue brings the importance of Dr. Hamlin's testimony into sharp relief. He is the sole expert offered by the State in this case. No doubt, his fact testimony as to his role in the underlying events is available to show what happened. But for the State to rely on his testimony to rebut Hayek's experts on the utility of Hayek's ventilators for COVID patients with ARDS, he must be able to testify as an expert witness. If he can do so, and his testimony sufficiently contests the competing testimony of Hayek's experts, then this case would quickly become the sort of "classic battle of the experts that should be played out for the finder of fact." *State v. Burgess*, 188 Vt. 235, 243–44 (2010).

The record shows, however, that the State failed to disclose Dr. Hamlin as an expert in a timely manner. This is likely why he was never deposed, but due to this non-disclosure, he cannot offer an expert opinion in this case. *Follo v. Florindo*, 2009 VT 11, ¶¶ 18–21. Moreover, even if the court concluded to the contrary, his testimony, so far as it has been developed—there is precisely one affidavit—would likely be insufficient to avoid summary judgment on liability in any event.

---

[4] This is because the provisions of warranty under the relevant commercial codes allocate the risk to sellers but require buyers to assert either as a direct claim or an affirmative defense. See 9A V.S.A. § 2-303.

Expert disclosure requirements are set forth at Rule 26(b)(5).  In 2019, that rule was amended to make clear that, if sought with an appropriate interrogatory, "each person" anticipated "at trial to present expert testimony under Vermont Rules of Evidence 702, 703, or 705, *whether or not the witness may also testify from personal knowledge as to any fact in issue in the case*" must be disclosed.  See Reporter's Notes—2019 Amendment, V.R.C.P. 26 (emphasis added).  There is no dispute that there has long been such an interrogatory in this case, and that the State has had a duty to supplement interrogatory responses throughout.  V.R.C.P. 26(e).  Nevertheless, when the summary judgment motions were filed, the State had not disclosed Dr. Hamlin as an expert, and he had not been deposed.  It became clear during briefing that the State was in fact relying on his *expert* testimony (an affidavit) to establish that Hayek's machines were unfit for the purpose of treating COVID-derived ARDS.  This prompted Hayek to object that he had never been disclosed as an expert, which in turn prompted the State to file its motion to "clarify" Dr. Hamlin's status vis-à-vis the scheduling order.

The most recent scheduling order in this case was stipulated to by the parties and then approved by the court on October 16, 2024.  That Order provided that "Defendant shall disclose experts within one month after the State's deposition of Plaintiff pursuant to Rule 30(b)(6)."  The Order further provided that the Rule 30(b)(6) depositions must be taken "within 45 days of the Court's decision on the [then anticipated] State's Motion to Compel the Rule 30(b)(6) Notice and 30(b)(5) Deposition Duces Tecum."  The State filed that motion to compel on October 28, 2024, and amended it on November 21.  The court denied it on May 9, 2025.  The May 9th decision triggered the State's obligation to conduct the 30(b)6) decision within 45 days and fixed the State's deadline to disclose experts at no later than a month after that.  As Hayek calculates it, the latest that deadline could have been conducted was on July 23, 2025.  The State did not purport to disclose Dr. Hamlin as an expert until October 16, 2025, the same date it filed its motion to clarify.  Even if the disclosure were adequate (which is reasonably contested), it is plainly long out of time to be made.

On June 20, 2025, the State did file a motion to extend times under the scheduling order in an open-ended fashion.  On September 3, 2025, the court denied the June 20 motion.  Specifically, the Court ruled:

9

> Shortly before the Court denied the State's [October 28, 2024] motion to compel, the State filed a motion for summary judgment (April 11, 2025), and Hayek filed a cross-motion for summary judgment on May 30. The motions address liability in general and, if there is potential liability, whether an 85% penalty provision is part of the contract. Neither party has indicated that any remaining discovery is necessary before a ruling on the pending summary judgment motions. See Vt. R. Civ. P. 56(d). To the extent either does, such a claim would need . . . to be asserted and adequately supported in regard to that motion.
>
> In these circumstances, the Court has determined to defer a ruling on the motions to amend the scheduling order pending a decision on the cross-motions for summary judgment. This case is over five . . . years old, and it has been bogged down with discovery disputes for much of that time. The State's proposed amendment to the current scheduling order is open-ended and does not create a firm timeline to resolve any remaining discovery issues. The Court's May 9 Order was not an invitation to open-ended discovery. It recognized the importance of completing discovery fairly and gave Hayek a concrete period of time—21 days—to supplement. It then ordered that if there were any remaining issues, the parties must confer "promptly." They evidently still have not done so despite the ongoing controversy.
>
> Further, the summary judgment motions may well change the scope of the action dramatically. The potentially dispositive motions could result in a ruling that eliminates the need for further discovery altogether or that, at least to some extent, may inform or narrow the need for further discovery. The prudent course is for the Court to defer ruling on the State's motion pending a decision on the cross-motions for summary judgment. The motion may be renewed or supplemented, if appropriate, within 14 days of such a ruling.
>
> *Until then, the May 9 Order stands.*

Opinion and Order at 3–4 (filed September 3, 2025) (emphasis added). It is reasonably clear that the discovery that the State contended was incomplete addressed damages issues. It did not expressly address the pending summary judgment motions. Moreover, the September 3d Order did not extend the May 9th deadlines but expressly affirmed them. While the September 3d Order keeps open the possibility that the court might permit some additional discovery following a summary judgment decision, it did not, as the State now appears to contend, operate to relieve the State of all discovery deadlines. That is not a fair or reasonable interpretation of the court's orders or this series of events.

10

Nor is there any ascertainable reason why the State might have needed to await further discovery to disclose Dr. Hamlin as an expert. There is no indication in the record whatsoever that his expert testimony on the matter of fitness would be any different before or after summary judgment than it would have been on the day this case was filed. The ostensibly remaining need for discovery relates to damages, not fitness. The deadline to disclose experts in a scheduling order defines the outer limit for doing so. The State could have disclosed Dr. Hamlin *at any time* over the more than 5 years that this case has been pending. By choosing not to disclose Dr. Hamlin, the State acted at its own peril.

In this respect, it is also important to distinguish between Dr. Hamlin's role as a fact witness and the role of an expert being assigned to his affidavit by the State. To the latter, the State is seeking to use Dr. Hamlin as a general expert on the medical use of ventilators for treating ARDS as well as the nature of COVID-derived ARDS and whether Hayek's ventilators were fit for this use. This is functionally broader and more expansive testimony than the limited expert opinion Dr. Hamlin has offered and might offer to explain why he determined in 2020 that only positive pressure ventilators could give the "best care we could provide" and why he came to the conclusion that he would not recommend them. In other words, Dr. Hamlin might testify about his April 22, 2020 letter and the reasons that he came to those conclusions at that time, but he has not been disclosed as a witness to testify why either Hayek should have known in March 2020 that its products were not fit for the particular purpose of treating the newly emerging cases of COVID-derived ARDS or the more general question of whether negative pressure ventilators can ever be used to treat this particular ARDS condition, with or without augmented equipment.

The distinction can also be understood as one of *time* and *scope*. It is undisputed that Hamlin did not offer, and the state did not incorporate, his opinion into the March 2020 negotiations and contract formation. Therefore, the opinion cannot be said to have formed or affected the particular purpose or defined fitness at the *time* of formation. The State's effort to expand the scope of Hamlin's opinion into a broader opinion that Hayek's ventilators are definitively unsuited for treating COVID-derived ARDS is an expansion of *scope* that runs against the lack of disclosure under Rule 26(b)(5). It takes his April 2020 recommendation and turns it into an expert opinion of unfitness. Dr. Hamlin may be qualified to offer such an opinion, and he may have done additional research, review, and study to form this opinion, but

11

the State's failure to disclose this intent to use this opinion more broadly means that Hayek was without notice of this critical shift and expansion in the *scope* of his testimony.

These distinctions are consistent with the critical procedural history of this case. The State did not comply with an express deadline to disclose Dr. Hamlin as an expert under Rule 26(b)(5). Since he was not disclosed in a timely manner, he was never deposed. Now, at the close of summary judgment briefing, the State seeks to alter its course, which the Court cannot, under the Rules and in fairness to the parties, permit. *Folio*, 2009 VT 11, at ¶¶ 18–21. The court finds that Dr. Hamlin, though he remains a fact witness at the center of the narrative of this case, may not testify as an expert witness on this issue of whether the Hayek ventilators were fit for the particular purpose sought in March 2020 or the larger question of fitness for treating ARDS cases. This finding or clarification is not a sanction. It is simply the logical consequence of the State's failure to disclose Dr. Hamlin as an expert.

Because Dr. Hamlin cannot testify as an expert, the State has no effective way to confront Hayek's expert testimony as to fitness or to present any evidence of its own as to the lack of fitness. Without being able to establish a breach of the warranty of fitness for a particular purpose, the State cannot avoid liability on Hayek's breach of contract claim. The other formulations of the State's argument (misrepresentation, mutual mistake, etc.) do not change this outcome.

Although ultimately unnecessary to resolve, it is at least questionable whether Dr. Hamlin's affidavit on its own would have been sufficient to steer this case into a factual battle of the experts. It is geared toward showing what the standard treatment protocol for COVID patients was and how public health and medical consensus at the time was evolving to incorporate positive pressure ventilators as the approved standard. While it may support the idea that a negative pressure ventilator cannot be incorporated into such a treatment protocol as a one-to-one substitute for a positive pressure ventilator, it does not address or rebut, except in a conclusory fashion, the broader reasons offered by Hayek's experts to the effect that its negative pressure ventilators can be used along with other equipment to treat COVID patients with ARDS and were under the broader standards of the contract, fit for the particular purpose.

III.     *The penalty provision*

The amount of damages Hayek may or may not be entitled to in this case is not presently before the court. However, the parties have briefed a related issue: whether an 85% penalty provision is part of their contract. The contract between the parties was never reduced to an integrated writing. It was formed in the back and forth between agents of Hayek and the State on email. See Convention on Contracts for the International Sale of Goods, Art. 11 ("A contract of sale need not be concluded in or evidenced by a writing and is not subject to any other requirement as to form."). In one of those emails, Hayek asserted that any cancelation 24 hours after placing an order would be subject to (an extraordinary) 85% penalty fee. The question is whether that provision became a binding term of the contract.

The Convention addresses contract formation at Articles 14–24. Certain of those provisions are of paramount importance in this case:

Article 14

(1)      A proposal for concluding a contract addressed to one or more specific persons constitutes an offer if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance. A proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price.

.   .   .

Article 18

(1)      A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance. Silence or inactivity does not in itself amount to acceptance.

.   .   .

Article 19

(1)      A reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer.

(2)      However, a reply to an offer which purports to be an acceptance but contains additional or different terms which do not materially alter the terms of the offer constitutes an acceptance, unless the offeror, without undue delay,

objects orally to the discrepancy or dispatches a notice to that effect. If he does not so object, the terms of the contract are the terms of the offer

       (3)    Additional or different terms relating, among other things, to the price, payment, quality and quantity of the goods, place and time of delivery, extent of one party's liability to the other or the settlement of disputes are considered to alter the terms of the offer materially.

.   .   .

Article 23

     A contract is concluded at the moment when an acceptance of an offer becomes effective in accordance with the provisions of this Convention.

Article 29(1) further provides that "A contract may be modified or terminated by the mere agreement of the parties."

It should be apparent, then, that a "contract arises when a sufficiently definite offer is accepted without material change" and "after that date, unilateral material additions will not be considered to be part of the agreement," though the parties subsequently may "affirmatively express their consent to new or different material terms, per Article 29." 3 Litigation of International Disputes in U.S. Courts § 12:13; see also *id*. § 12:22. The Convention "may be described as employing a surplus-out rule. Under the surplus-out rule, one identifies that last date on which a mirror-image agreement as to essential terms occurred. That is the contract. The contract may be amended by such additional material terms as the parties intended to agree. Gaps are filled predominantly by industry custom (or practice and usages if the parties already have a relationship)." *Id*.; accord *Chateau des Charmes Wines Ltd. v. Sabate USA Inc*., 328 F.3d 528, 531 (9th Cir. 2003).

The following communications between the parties are sufficient to resolve the dispute over the penalty provision. On March 18, 2020, Hayek (via Daniel Quigley) sent the Vermont Governor's Office an email indicating that it had ventilators available. That email was forwarded on the same day to Mr. Christopher Herrick, Deputy Commissioner of the Vermont Department of Public Safety (DPS). Mr. Herrick then contacted Mr. Quigley inquiring regarding an interest in 1,000 ventilators. Mr. Quigley responded:

14

> With regards to your request for 1000 ventilators, I can allocate 50 ventilators over the next few weeks for Vermont. We can work on an additional allocation past the 50 in the very near future.
>
> Do you want to proceed forward with a quote of 50 ventilators?
>
> If so, our pricing team will send a quote soon. Please advise.

Still on March 18, Hayek (via Mary-Ellen Morrison) sent Mr. Herrick a quote for 50 ventilators ($1,499,950).

On March 19, DPS's financial director, Richard Hallenbeck, drafted a purchase order for 50 ventilators conforming to the March 18 quote. He then learned that only 25 were available. He modified the purchase order by hand to reflect 25 ventilators at the unit price conforming to the quote and sent it to Hayek. Later, still on March 19, Hayek responded:

> Thank you for your recent Purchase Order to Hayek Medical Devices (North America) LTD.
>
> As attached, please confirm the purchase order number. It currently reads at PO# COVID19 -01. If this is not the correct PO#, please provide the correct PO# below.
>
> Our payment options are prepaid via a credit card or Net 14 via an invoice.
>
> We ship via FedEx of UPS. We do not pre-pay and add shipping.
>
> Please answer the following questions:
>
> · What is the correct PO#?
>
> · Payment Options: Prepay with a credit card, or Net 14 payment terms?
>
> · Do you prefer FedEx of UPS shipping?
> · FedEx Account#:
> · UPS Account #:
>
> Once we receive a reply confirming the above, we can continue processing your purchase order.

Mr. Hallenbeck responded:

> The correct PO# is COVID19-01
> We prefer an invoice as our credit card single purchase limit is $2,500

UPS Account number is 041530.  Please ensure this is shipped to the address on the PO as it differs from the address under the UPS account number for the Vermont Department of Public Safety.
If you need anything else please let me know.

There were further communications between the parties about some collateral details as well as shipping.  All such details were worked out, and it was agreed that the shipping expense would be added to the invoice.  At 6:30 p.m. on March 19, Mr. Hallenbeck responded to Hayek: "Thanks!  When you know the cost of shipping please pass it along."  At this point in the communications, no penalty provision had ever been mentioned.

Then, on March 20 at 2:15 p.m., Hayek sent an email to Mr. Hallenbeck that said:

Thank you for your purchase order, PO# COVID19-01.  Your Hayek Medical Devices order number is 10187.  Please find attached.

Order #10187 is in process with an expected ship date of 23 March 2020.  Our logistic team will send shipping confirmation details once dispatched.

As a reminder, purchase orders may be cancelled by Customer no later than twenty (24) hours after issuance, including weekends.  If a Customer desires to cancel an order later than twenty (24) hours after the issuance of such purchase order, the Customer agrees to pay Hayek Medical Devices (North America) Ltd eighty-five (85) percent of the purchase order value as penalty.

This was the first mention of a penalty provision, which also appeared in the attached order confirmation notice.

At 9:20 p.m. on March 20, Mr. Quigley then indicated that the remaining 25 ventilators could be supplied:

In speaking with our production team, I am able to allocate and fulfill the remaining 25
ventilators from your purchase order.  We anticipate a lead time of roughly 10–15 business days for the remaining 25 ventilators.

Would you like to proceed with the balance of your purchase order?

Mr. Hallenbeck responded the following day: "That sounds great.  Could you please fulfil the additional 25 units on our PO and include two adult size circuits?  If you could include the shipping in the invoice that would be ideal.  Let me know if anything additional is needed to

16

process the order." Mr. Quigley responded: "Thank you for the confirmation of the additional 25 ventilators. We will require the original PO showing the qty of 50. The current PO is redlined to show 25." He later said, still on March 21, "Once in receipt of the updated order, we will give the green light to production." In response, Mr. Hallenbeck sent the original, unedited March 19 purchase order for 50 units, which again conformed to the March 18 quote from Hayek.

On March 22, Mr. Hallenbeck emailed Mr. Quigley asking him to "confirm you have what you need to get the additional 25 units shipped." Mr. Quigley responded: "Nothing else is needed at this point. / The balance of PO has been received and sent for processing."

The first ventilators began arriving in early April.

The only mention of a penalty provision between the parties was in the March 20 (2:15 p.m.) email from Hayek to the State. However, by March 19, the parties' contract for the first 25 ventilators had been formed. "For a binding contract to be concluded, a valid offer in terms of Article 14 must be made to the offeree and accepted by the offeree in accordance with the provisions of Article 18." 4 International Contract Manual § 97:9. Under Convention, Art. 14(1),

> A proposal for concluding a contract addressed to one or more specific persons constitutes an offer if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance. A proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price.

Article 18 provides: "A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance." By March 19, the parties were in agreement on quantity and price, and manifested assent to be bound. No material terms remained to be determined. That was the contract. It did not include a penalty provision.

When Hayek attempted to add a penalty provision on March 20, the surplus-out rule squarely prevented it because the State never assented to it. At most, the State was silent in response. "Silence or inactivity does not in itself amount to acceptance." Convention, Art. 18(1); see also Article 29(1) ("A contract may be modified or terminated by the mere agreement of the parties."). Hayek has come forward with no appreciable evidence of agreement by the

State to the penalty provision. An extraordinary penalty provision totaling almost the entire contract price surely required some manifestation of assent clearer than mere silence.

When the parties later modified the contract quantity from 25 to 50, there was no further mention of the penalty provision by either side. The mere fact that the penalty provision remained in the email string as the parties conversed in no way indicates that the State ever assented to it. It merely indicates that a rejected term first proposed after the contract was formed remained in an email string and remained unaddressed and unacknowledged.

To the extent that Hayek argues that its March 20 communication with the penalty provision operated as a rejection of an offer without such a provision and a proposal for one with a penalty provision, it was not. That argument is entirely foreclosed by the formation of the contract the day earlier and the surplus-out rule. "Once a contract has been concluded, the parties are bound by the terms of their agreement and cannot after the event be unilaterally modified by one of the parties." 4 International Contract Manual § 97:13.[5]

As such, the effective contract terms do not include the 85% penalty provision.

## ORDER

For the foregoing reasons, the State's motion to clarify is denied to the following effect: Dr. Hamlin is not permitted to testify as an expert in this case. The parties' cross-motions for summary judgment are granted in part and denied in part to the following effect: the State's warranty of fitness for a particular purpose defense is **Denied.** Hayek's motion for summary judgment on liability is **Granted in part.** The State is liable for breaching the contract. As to the penalty provisions, Hayek's motion for summary judgment is **Denied in Part,** and the State's motion is **Granted in Part** as the evidence demonstrates that no agreement was reached on the penalty provisions from the March 20th email, which came after initial contract formation. Therefore, the 85% penalty provision terms do not apply as a matter of law.

---

[5] While this analysis is dispositive to the issue of the 85% penalty provisions, Court notes that this conclusion is consistent with the legal limitation on such provisions that the damage term must provide a reasonable liquidated damage estimate and may not function as a penalty for a breach. *Highgate Associates, Ltd. v. Merryfield*, 157 Vt. 313, 316 (1991). This limitation, by extension, is also consistent Articles 61, 74, 75, 76, and 77 of the Convention, which limit damages to sums equal to lost profit and other losses incurred as the consequence of a breach with the limit that the non-breaching party must mitigate, and the breaching party is entitled to deduct the benefit from such substitute transactions.

The Court will set this matter for a status conference to address the remaining issue of damages and whether the parties need additional discovery on these points.

Electronically signed on 1/3/2026 12:38 PM pursuant to V.R.E.F. 9(d)

_____

Daniel Richardson
Superior Court Judge